[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11141

_____

KAMERON BUTLER,

Plaintiff-Appellant,

*versus*

CHARLENE SMITH,
individually,

Defendant-Appellee,

CITY OF CONYERS, GEORGIA,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-03150-JPB

———————————

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

NEWSOM, Circuit Judge:

Parenting is hard.  Raising children requires patience, sacrifice, and tenderness.  It also requires tough choices.  And sometimes it requires tough love.  Even the most well-intentioned parents struggle to get the balance just right.

That struggle was real for Kameron Butler, a single mother of three who worked outside the home as a medical assistant.  When Butler and her family moved to a new school district, she gave her 17-year-old son, Jayden, a choice:  He could either enroll at the school for which he was now zoned, in which case he would have access to bus service to and from campus, or he could remain at the school where he'd been for three years, in which case, due to her work schedule, they'd have to get creative about his afternoons.  If he opted to stay, she said, Jayden could either walk several miles home or spend the afternoons at school or at a local park until she could pick him up.  Given the choice, Jayden opted to stay at the school he knew.

We'll get into the details soon enough, but in short, a school resource officer, Charlene Smith, took issue with Butler's plan for managing Jayden's afternoons and, eventually, sought and

obtained arrest warrants for first- and second-degree child cruelty—felonies that are punishable by mandatory prison terms and that target conduct, respectively, that "willfully deprives the child of necessary sustenance to the extent that [his] health or well-being is jeopardized" and that "with criminal negligence causes a child under the age of 18 cruel and excessive physical or mental pain." Ga. Code Ann. § 16-5-70(a), (c). Butler was arrested, charged with both crimes, and spent four days in jail before posting bond. All charges were eventually dismissed.

Butler sued Officer Smith for malicious prosecution under both federal and state law. The Fourth Amendment, under which federal-law claims for malicious prosecution arise, affords police officers significant latitude to seek arrest warrants based on "probable cause"—a reasonable (even if mistaken) belief that a crime has been committed. The doctrine of qualified immunity extends that latitude further, protecting an officer against liability provided that she had *arguable* probable cause. State-law immunity doctrines likewise give officers ample breathing room to make reasonable mistakes.

But even the most officer-protective doctrines have their limits. Officer Smith had Butler arrested on extraordinarily serious felony charges based on conduct that, by any objective measure, doesn't remotely qualify. And to make matters worse, the affidavits that Officer Smith submitted in support of her warrant applications conspicuously omitted material exculpatory information. Viewing the evidence in the light most favorable to Butler, as we

must, we hold that Officer Smith is not entitled to qualified immunity on Butler's Fourth Amendment claim and that Butler has presented a genuine factual dispute regarding Officer Smith's entitlement to official immunity on her state-law claim. We therefore reverse the district court's grant of summary judgment.

## I

## A

In the fall of 2017, Kameron Butler was a single working mother. Her 17-year-old son, Jayden, was starting his fourth year at Rockdale County High School in central Georgia. Like so many other parents and teens, Butler and Jayden had a strained relationship.

When the family moved to a new apartment zoned for the neighboring Salem High School, Butler gave Jayden a choice: He could either transfer to Salem, in which case he could ride the bus to and from school, or he could stay at Rockdale, but without the benefit of bus service. Bus service mattered, Butler explained, because while she could drop Jayden off in the mornings, her work schedule would prevent her from picking him up promptly after school in the afternoons. So if Jayden opted to remain at Rockdale, he could either (1) walk several miles home, (2) hang out in front of the school until early evening, when Butler could retrieve him, or (3) go to a local park to wait for her. Given the choice, Jayden decided to remain at Rockdale.

As expected, the afternoons proved challenging. None of Jayden's after-school options was perfect. If he walked home, he

wouldn't be able to get into the family's apartment because Butler had taken away his key after he had repeatedly skipped school and had friends over; instead, he would have to sit either in the apartment leasing office until it closed or underneath a shaded gazebo on the complex property. Remaining on school grounds violated school policy. Neither the school nor the park had vending machines, and the school lacked outdoor water fountains—meaning, in either event, that Jayden would have to plan ahead to pack a snack, water bottle, etc. Jayden's attempt to improvise a fourth alternative—going to the Brandon Glen apartments to hang out with friends—ended after he repeatedly got in trouble there; Butler flatly forbade him to go to Brandon Glen.

While at Rockdale, Jayden befriended the school resource officers—local cops assigned to the high school. Jayden developed a particularly close relationship with SRO Charlene Smith, with whom he frequently ate lunch and discussed his activities—for instance, his participation on the school's wrestling team, for which he was trying to "drop weight." Officer Smith occasionally gave Jayden money, got him a used bike, and, on a few occasions, drove him home without logging her trip, as department policy required officers to do when transporting minors.

On September 26, 2017, Jayden went to Brandon Glen apartments after school despite his mother's clear prohibition. When his mother refused to pick him up there, he chose to stay the night rather than walk home. The following morning, Jayden complained to Officer Smith, and the two of them called Butler to

discuss his afternoon situation. Officer Smith recorded the call. Officer Smith told Butler that Jayden wasn't allowed to be on campus unsupervised after school. In response, Butler explained her side of the story: (1) She worked and thus couldn't pick Jayden up immediately after school; (2) Jayden could walk home, but if he did, he couldn't get into the apartment because she had taken his key after he "skipp[ed] school" and "ha[d] people in the house"; (3) she would rather her fiancé not pick Jayden up because "there [was] a lot more to this going on" and because they had been having "serious behavior issues with Jayden since ninth grade"; but (4) Jayden could always walk to "Pine Log [Park]," and she would "pick him up from there." Butler also explained to Officer Smith why she had prohibited Jayden to go to Brandon Glen apartments: "We've had that discussion a million times—he's not allowed at Brandon Glen because he gets in trouble when he goes" there. "[B]ecause [Jayden was] not allowed" at the apartments, Butler continued, she would "not pick him up from there"—to which Office Smith responded: "That makes sense. If you told him not to go, and he goes, that makes sense."

During the call, Officer Smith told Butler that "the whole totality of things that [she was] doing" constituted "cruelty to children," that "school social workers [and] the police [were] involved," and that Butler could face "criminal charges." Butler responded by telling Officer Smith that she planned to "transfer [Jayden] to Salem." The three concluded the call by planning for that afternoon. Officer Smith reported that Jayden had said "he d[idn't] want to sit in the heat" at the park, and when Butler asked whether

Jayden could "walk home and just wait for [a family member] to open the door," Officer Smith said that he "d[idn't] want to do that either." When Butler admitted that she didn't "know what to tell him" then, Officer Smith relayed Jayden's comment that "he'll just walk."

Rather than walk home that afternoon as he had said he would, Jayden went the one place his mother had told him not to go: Brandon Glen. In a call to his mother that he secretly recorded, Jayden asked her to come pick him up. Butler refused, emphasizing that Jayden knew that she had forbidden him to go to Brandon Glen and that he had told her that he planned to walk home. Unaware that she was being recorded, and clearly frustrated, Butler was unfiltered:

> Jayden, I told you [that I would pick you up at] the school or Pine Log [Park]. That's what I told that bitch, that Officer Smith or whoever the fuck that was. I said the school or Pine Log. And she said you didn't want to go to either one, so you [were] gonna walk home.

Holding her ground, Butler repeatedly told Jayden that she wouldn't pick him up from Brandon Glen: "You went back to Brandon Glen. I made it perfectly clear to [Officer Smith] and you that I would not pick you up from Brandon Glen, that you're not allowed to go to Brandon Glen, and you do it anyway. And you did it again." Butler told Jayden that he should "just go home." When Jayden asked if she would pick him up from Pine Log Park, Butler responded—seemingly in response to his disobedience—

"No, I'm not now, no." Instead, she said, he could "[g]et [a] ride from somebody over in Brandon Glen, call Officer Smith, call somebody . . . who takes your pity party, call one of them to drop you off at the house and I will be there soon."

The call ended inauspiciously, with Butler recapping the substance of their earlier conversation with Officer Smith and reiterating her refusal to pick Jayden up from Brandon Glen, and with Jayden then signing off:

**Butler:**    [Officer Smith] asked you right then and there. Where were you gonna go? Were you gonna stay in the school or were you gonna go to Pine Log? And you told her that you didn't wanna do either one because you didn't want to be in the heat. So you told her to tell me that you were walking home. That's where I thought you was gonna be at. When I got home, you weren't there. I have left out again. So you can get a ride to the house, and I'll let you in when I get there. But I'm not going to Brandon Glen. I told her that, and I told you that. I can go to Brandon Glen, but I won't.

**Jayden:**    Alright, that's all I need you to say. Alright, bye.

Jayden did not walk home. Instead, he texted Officer Smith, who picked him up and drove him.

The next morning, Jayden provided Officer Smith with the recording of his call with his mother. Although she now denies it, a colleague's notes reflect (perhaps not surprisingly) that Officer Smith felt disrespected when she listened to the recording. Later that same day, and after obtaining a statement from Jayden, Officer Smith sought two arrest warrants, one each for first- and second-degree child cruelty—both felonies. The first-degree offense prescribes a five-year mandatory-minimum sentence for "willfully depriv[ing a] child of necessary sustenance to the extent that the child's health or well-being is jeopardized." Ga. Code Ann. § 16-5-70(a). The second-degree offense prescribes a one-year mandatory minimum for conduct that, "with criminal negligence[,] causes a child under the age of 18 cruel or excessive physical or mental pain." *Id.* § 16-5-70(c).

In support of the warrant applications, Officer Smith submitted two short affidavits. With respect to first-degree child cruelty, she alleged that—

> Kameron Butler committed the offence [sic] of cruelty to children when she refused to pick her son, Jaylen [sic] Butler, up from school. Jaylen [sic] Butler was told to stay in front of the school from 15:05-19:00 hours. Kameron Butler allowed her boyfriend, Montrez, to pick up the little sister at C.J. Hick[s] at approximately 14:30 hours. Montrez will not pick Jaylen [sic] Butler up from school, but the schools are

across the street from each other. On 9/25 Jaylen [sic] Butler took Uber home and had to sit outside until 9:00. 9/26 [Jayden] Butler had to go over to a friends's [sic] house because his mother wouldn't pick him up.

Concerning second-degree child-cruelty, she added that—

Kameron Butler committed the offense cruelty to children in the second degree when she leaves her son, Jayden Demille Butler up at Rockdale County High School from 15:05 until approximately 19:00 hours without food or water, and to indure [sic] the heat. Jayden Butler has a heart condition (irregular heartbeat) and should not indure [sic] long periods without food, water or heat.

Based on Officer Smith's affidavits—and with her oral clarification that Jayden was 17 years old—the magistrate judge issued both warrants.

That evening, Officer Smith texted Jayden and, when he didn't respond within about ten minutes, asked a police unit to go to his apartment to check on him—and informed the officers about the outstanding warrants. Butler was arrested and charged with both felonies. She spent four days in jail before she was eventually released on bond. All charges against Butler were dismissed four months later.

**B**

Butler sued Officer Smith and the City of Conyers, alleging malicious-prosecution claims under both federal and state law.

After the City was dismissed from the case, the district court granted Officer Smith summary judgment on the ground that she had probable cause to believe that Butler had engaged in both first- and second-degree child cruelty. This is Butler's appeal.

## II

We review a district court's grant of summary judgment de novo. *See Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021). Importantly here, "[a]ll evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." *Id*. With that standard firmly in mind, we will consider Butler's federal- and state-law claims in turn.

## A

The Supreme Court has recognized a Fourth Amendment claim for malicious prosecution, which, it has explained, is "sometimes referred to as a claim for unreasonable seizure pursuant to legal process." *Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022). Because the claim is a mashup of sorts, the plaintiff must prove both "(1) the elements of the common-law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Blue v. Lopez*, 901 F.3d 1352, 1357 (11th Cir. 2018).

"[T]he constituent elements of the common law tort of malicious prosecution include[]: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor;

and (4) caused damage to the plaintiff accused." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)) (alteration in original). The Fourth Amendment overlay adds two elements: The plaintiff must establish (5) "that the legal process justifying [her] seizure was constitutionally infirm" and (6) "that [her] seizure would not otherwise be justified without legal process." *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020). Qualified immunity, in effect, adds yet another element—namely, (7) that that the law was "clearly established." *Id.* at 1168.

We can make quick work of elements (1), (3), (4), and (6). *First*, Officer Smith initiated the child-cruelty prosecutions by seeking and obtaining the warrants. *Third*, the prosecution terminated in Butler's favor when the charges against her were dismissed. *See Thompson*, 142 S. Ct. at 1341. *Fourth*, the prosecution caused her damage by landing her in jail for four days. And *sixth*, because Butler was detained for longer than 48 hours, her seizure would have been "presumptively unconstitutional"—and thus not otherwise justified—if effectuated without legal process. *Williams*, 965 F.3d at 1164 (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991)).

On the merits, so to speak—we'll return to qualified immunity in due course—that leaves elements (2) and (5). Happily, this Court recently explained that there is "significant overlap" between a malicious-prosecution claim's common-law and constitutional components and, indeed, that what we have called the

second element effectively merges into the fifth. *See Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) ("If a plaintiff establishes that a defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process, he has also established that the defendant instituted criminal process against him with malice and without probable cause."). Accordingly, we can focus here on element (5)—whether "the legal process justifying [the plaintiff's] seizure was constitutionally infirm." *Williams*, 965 F.3d at 1165.

A plaintiff can prove that the warrant used to arrest her was "constitutionally infirm" by showing either that "the officer who applied for the warrant should have known that [her] application failed to establish probable cause" or that the officer "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Id.* at 1165 (citations omitted). For reasons explained in the next section, we conclude—drawing all factual inferences in Butler's favor—that the affidavits Officer Smith filed in support of her warrant applications omitted material exculpatory information that, had it been disclosed, would have negated probable cause.

Finally, a brief word about qualified immunity. For malicious-prosecution claims, we ask whether the *type* of shortcoming in the warrant application—such as offering "a conclusory affidavit that clearly is insufficient to establish probable cause," *Luke v. Gulley*, 50 F.4th 90, 97 (11th Cir. 2022) (quotation marks omitted), or "knowingly or recklessly mak[ing] false statements in an arrest affidavit . . . if such false statements were necessary to the probable

cause," *Laskar v. Hurd*, 972 F.3d 1278, 1297 (11th Cir. 2020) (quotation marks omitted)—was "clearly established." Here, it was and is clearly established that intentionally or recklessly omitting material information from a warrant affidavit violates the Fourth Amendment. *See Paez*, 915 F.3d at 1287 (considering it clearly established that a warrant affiant cannot omit known material facts).[1]

**1**

Before jumping in, an important clarification regarding the universe of information that a reviewing court may consider when evaluating a Fourth Amendment malicious-prosecution claim: Unlike with a false-arrest claim challenging a warrantless arrest, probable cause in a malicious-prosecution claim challenging an arrest pursuant to a warrant can't be shown by reference to information in an officer's investigative file or mind absent a "record . . . that he submitted the file to or explained his thought processes to the

---

[1] We are unmoved by Officer Smith's argument that recklessness isn't enough. *Kelly v. Curtis*, 21 F.3d 1544 (11th Cir. 1994), on which she relies, didn't hold that reckless misstatements in (or omissions from) a warrant application don't violate clearly established law. Rather, it merely held, on the facts before it, that "a reasonable officer might not have known that he was acting recklessly, rather than negligently, in asserting without investigation" that police hadn't received an exculpatory lab report when, unbeknownst to the officer, they had. *Id*. at 1554 (explaining that to succeed on his malicious-prosecution claim, the plaintiff "must prove that a reasonable officer would have known that [the officer's] testimony was not just negligently false, but recklessly so"). As we have explained, and will recount, a jury could reasonably determine that Officer Smith actually, subjectively knew the facts that she omitted from her affidavits and that her nondisclosure of those facts was, at the very least, reckless.

magistrate judge." *Luke*, 50 F.4th at 96. Put another way, "an otherwise insufficient affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the warrant but not disclosed to the issuing magistrate." *Williams*, 965 F.3d at 1162 (quoting *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971)) (alteration in original). The reason for the distinction is that whereas "the lawfulness of a warrantless arrest turns on whether the arresting officer had probable cause, the lawfulness of seizures pursuant to legal process turns on the validity of the legal process itself." *Id.* (citations omitted). Accordingly, for purposes of assessing Butler's malicious-prosecution claim—which challenges the legal process— we consider only (1) the information that was before the magistrate, either in Officer Smith's formal affidavits or otherwise, minus (2) any material misstatements that Officer Smith might have made, plus (3) any material information that she omitted from her affidavits. *See Paez*, 915 F.3d at 1287 ("Our only question, then, is whether the affidavits still would have established probable cause . . . if they had included the omitted information . . . ."). And of course, given the summary-judgment posture, our assessment of that limited universe of information must credit Butler's evidence and draw factual inferences in her favor. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (vacating a grant of summary judgment and remanding for further proceedings because the Fifth Circuit "failed to adhere to the axiom that in ruling on a motion for summary judgment, [t]he evidence of the nonmovant is to be believed, and

16                    Opinion of the Court                    22-11141

all justifiable inferences are to be drawn in his favor") (internal quo-
tation marks omitted).[2]

a

First, the summary-judgment record reveals only three
items before the magistrate judge: Officer Smith's two written affi-
davits and her oral statement that Jayden was 17 years old. Recall
that Officer Smith's affidavit in support of the first-degree child-cru-
elty charge alleged that—

> Kameron Butler committed the offence [sic] of cru-
> elty to children when she refused to pick her son,
> Jaylen [sic] Butler, up from school. Jaylen [sic] Butler
> was told to stay in front of the school from 15:05-
> 19:00 hours. Kameron Butler allowed her boyfriend,
> Montrez, to pick up the little sister at C.J. Hick[s] at
> approximately 14:30 hours. Montrez will not pick
> Jaylen [sic] Butler up from school, but the schools are
> across the street from each other. On 9/25 Jaylen [sic]
> Butler took Uber home and had to sit outside until

---

[2] The district court and Officer Smith's briefing before us impermissibly relied
on facts known to Officer Smith but not provided to the magistrate judge. *See,
e.g.*, Br. of Appellee at 26–28. At oral argument, Officer Smith defended her
reliance on such facts based on what she characterized as a lack of record evi-
dence about what was, in fact, before the magistrate judge. *See* Oral Arg. at
22:30–22:43. But again, on summary judgment, we view the facts in the light
most favorable to Butler as the nonmovant. Accordingly, if there isn't undis-
puted evidence that an inculpatory fact *was* before the magistrate, then we
must assume that it *wasn't*. *Cf. Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th
Cir. 2003) (explaining how to treat disputes about whether a misstatement was
before the magistrate judge).

22-11141                Opinion of the Court                17

> 9:00. 9/26 [Jayden] Butler had to go over to a friends's [sic] house because his mother wouldn't pick him up.

And her affidavit concerning the second-degree charge added that—

> Kameron Butler committed the offense cruelty to children in the second degree when she leaves her son, Jayden Demille Butler up at Rockdale County High School from 15:05 until approximately 19:00 hours without food or water, and to indure [sic] the heat. Jayden Butler has a heart condition (irregular heartbeat) and should not indure [sic] long periods without food, water or heat.

So, in determining whether the warrants that Officer Smith sought and obtained were supported by probable cause, all of those facts are fair game.[3]

**b**

We needn't subtract out any material misstatements in the information that Officer Smith put before the magistrate judge because we conclude that there weren't any. Butler asserts that Officer Smith's second affidavit's statement that "Jayden . . . has a

---

[3] We reject Butler's contention that we can consider the facts alleged in each affidavit only with respect to "its" corresponding offense. The magistrate had both affidavits before him, and he considered the warrant applications simultaneously. The parties agree that we can consider the verbal statement regarding Jayden's age in conjunction with both crimes, and it wouldn't make sense to treat written statements any differently.

heart condition (irregular heartbeat)" was false, but she misunderstands the leeway that the Fourth Amendment gives law enforcement officers to make reasonable mistakes. An officer who files an affidavit in support of an arrest warrant need only have "a reasonable belief in [the] veracity" of the information that she provides, regardless of whether it ultimately turns out to be true. *Paez*, 915 at 1286–87. So, for instance, an officer is "[g]enerally . . . entitled to rely on a victim's criminal complaint as support for probable cause." *Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998). Although there is on this record a genuine dispute about whether Jayden actually had a heart condition, it is undisputed (1) that Jayden told Officer Smith that he had one and (2) that he had worn a heart monitor. Those facts, we think, amply support the conclusion that Officer Smith had "reason[ to] belie[ve] in [the] veracity" of her statement to that effect. *Paez*, 915 F.3d at 1286.

### c

Material omissions are a different story. We find five such omissions—five pieces of information that a jury could find Officer Smith "knew about but intentionally or recklessly disregarded" in her affidavits. *Id.* at 1287. She learned about the first four on the call with Butler; she had independent knowledge of the fifth. We discuss each omission in turn, but consider them, as we must, in their totality. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (explaining that probable cause depends on the totality of the circumstances, a standard that "precludes . . . [a] divide-and-conquer analysis").

First, Officer Smith knew—but omitted from her affidavits—that Jayden had chosen, in full view of the transportation challenges that it would present, to stay at Rockdale rather than transfer to Salem. Indeed, as soon as Officer Smith suggested that Jayden shouldn't have to "hang out" at school or the park until Butler could get there to pick him up, Butler emphasized (1) that transferring to Salem would resolve all their issues but (2) that Jayden had decided against it:

> Unless he wants to transfer to Salem, then he can get on the bus. But he wanted to be at Rockdale when we moved, so, if he wants to transfer to Salem then he can do that because that's in our district.

When Officer Smith shortly thereafter suggested that Butler was engaged in criminal misconduct, Butler responded by placing Jayden's choice front and center:

| **Officer Smith:** | You know that's cruelty to children? . . . [J]ust the whole totality of things that you're doing. You won't pick him up. [You l]eave him up here for four hours. |
|---|---|
| **Butler:** | . . . I did that because he said he wanted to be at Rockdale, he wanted to graduate from there. If he wants to go to Salem, then I will transfer him over to Salem, and he can catch the bus. But that isn't at all cruelty to children. |

Deprived of the knowledge that Jayden had *chosen* to remain at Rockdale rather than transferring to the school for which he was zoned, the magistrate judge couldn't accurately assess Butler's responsibility for Jayden's afternoon transportation challenges.

Second, Officer Smith knew—but omitted from her affidavits—that Jayden had options other than remaining at school: He could "walk up to Pine Log [Park]," near the school, or "walk home."

Third, Officer Smith knew—but again omitted—that Butler said she had taken away Jayden's house key "because he had people in the house, he was skipping class, going home, and doing what he wants to do." Denied that explanation, the magistrate judge could well have been misled by the affidavits' statements that even if Jayden walked home he would "ha[ve] to sit outside until 9:00 [p.m]."

Fourth, while Officer Smith's affidavits stated that Jayden "had to go over to a friend['s] house because his mother wouldn't pick him up," she knew, but omitted, the fact that Jayden went to the friend's—at Brandon Glen—despite his mother's express prohibition. As already noted, Butler had explained her rule—which Officer Smith agreed "ma[de] sense"—at length and in detail during their call:

> [I]f he goes to Brandon Glen [Apartments], then . . .
> his friend . . . needs to drop him off. We've had that
> discussion a million times. He's not allowed at Bran-
> don Glen because he gets in trouble when he goes to

Brandon Glen.  . . . [H]e'll call me at about 8, 9, 10 o'clock at night and say [his friend] can't drop him off, you need to come get me.  No. . . . I will not pick him up from there.  I can but I won't.  Because he's not allowed over there.

Fifth, Officer Smith knew—but omitted—additional facts about Jayden's food consumption, facts that undermined (or at the very least ameliorated) her affidavits' vague charge that Butler left him "without food or water."  Officer Smith often ate lunch with Jayden at school.  During these lunches, Officer Smith observed that—in her own words—Jayden was "always trying to drop weight [for wrestling], like he would eat salads sometimes."[4]

**2**

"[A]n affidavit's omissions may lead to an unreasonable and unconstitutional warrant-based arrest if information that the affiant knew about but intentionally or recklessly disregarded negates a finding of probable cause."  *Paez*, 915 F.3d at 1287.  Accordingly, the question we must answer is "whether [Officer Smith's] affidavits still would have established probable cause . . . if they had included the omitted information."  *Id.*

---

[4] Butler contends that Officer Smith also omitted from her affidavits the facts (1) that Jayden was not suffering any physical pain and (2) that Butler was a tireless and devoted mother.  *See* Br. of Appellant at 38.  We conclude, though, that based on what Jayden had told Officer Smith, she could reasonably (even if mistakenly) have believed that those things weren't true.  *See supra* at 18.

Well, with one caveat. Because Officer Smith's assertion of qualified immunity can be defeated only by a showing of "clearly established" law, we will review not for *actual* probable cause but rather for "'arguable' probable cause." *Grider v. City of Auburn*, 618 F.3d 1240, 1257 & n.25 (11th Cir. 2010).[5] The arguable-probable-cause standard asks whether a "reasonable officer[] in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). It protects officers who "reasonably but mistakenly conclude that probable cause is present." *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003) (quotations marks omitted). Probable cause, in turn, exists when

---

[5] There is some tension in our precedent regarding whether an actual or arguable probable-cause standard governs the qualified-immunity inquiry in a Fourth Amendment malicious-prosecution case. *Compare, e.g.*, *Williams*, 965 F.3d at 1168–70 (actual); *Luke*, 50 F.4th at 97 (same), *with, e.g.*, *Grider*, 618 F.3d at 1257–58 (arguable); *Paez*, 915 F.3d at 1286 (assuming arguable). We needn't resolve that tension here because we conclude that Butler prevails even under the more indulgent arguable-probable-cause standard. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) (discussing this approach); *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 994 (11th Cir. 2022) (applying it). There are also questions, in light of *Wesby*, 138 S. Ct. at 588, about whether the "reasonable officer could believe" standard is now just called "probable cause." *See Washington v. Howard*, 25 F.4th 891, 901 (11th Cir. 2022) (rejecting a version of the probable-cause standard that uses the word "would" and "conclud[ing] that the correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude that there was a substantial chance of criminal activity'") (alteration adopted) (quoting *Wesby*, 138 S. Ct. at 588). Because the issue doesn't matter here, we leave it for another day.

"a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." *Washington v. Howard*, 25 F.4th 891, 899 (11th Cir. 2022) (emphasis and citation omitted) (omission in original).

To assess probable cause, we look to the elements of the underlying crime—and in particular, in a malicious-prosecution case like this one, to the elements of the *charged* crime. *See Williams*, 965 F.3d at 1159–62 (holding that the so-called "any crime" rule—which applies to false-arrest claims arising out of warrantless seizures and holds that it is enough for the arresting officer to have probable cause to believe that *any* crime has been committed—doesn't apply to a malicious-prosecution claim arising out of an arrest made pursuant to a warrant). While an officer needn't prove every element of the charged crime, *see Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007), her knowledge that an element isn't met—or is exceedingly unlikely to be met—will preclude a finding of probable cause, *see Holmes*, 321 F.3d at 1081; *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998).

With that primer, we turn our attention to the controlling question: Given the (1) information that Officer Smith included in her affidavits and (2) the material information that she knew but omitted from those affidavits, could a reasonable officer have believed that probable cause existed to arrest Butler for first- or second-degree child cruelty? For the reasons that follow, we hold that the answer is no.

24                    Opinion of the Court                    22-11141

### a

Georgia law criminalizes first-degree child cruelty, a felony, as follows:

> A parent, guardian, or other person supervising the welfare of or having immediate charge or custody of a child under the age of 18 commits the offense of cruelty to children in the first degree when such person willfully deprives the child of necessary sustenance to the extent that the child's health or well-being is jeopardized.

Ga. Code Ann. § 16-5-70(a). The crime thus entails both what we'll call an "act" element—"willfully depriv[ing] the child of necessary sustenance"—and a "result" element—"to the extent that the child's health or well-being is jeopardized." With respect to the latter, Georgia courts have held that the phrase "necessary sustenance" refers to "that necessary food and drink which is sufficient to support life and maintain health." *Sanders v. State*, 715 S.E.2d 124, 127 (Ga. 2011) (citing *Caby v. State*, 287 S.E.2d 200 (Ga. 1982)); *Justice v. State*, 42 S.E. 1013, 1014 (Ga. 1902) (same). Reflecting the seriousness of the offense, first-degree child cruelty is punishable by a minimum of five and a maximum of 20 years in prison. Ga. Code Ann. § 16-5-70(e)(1).

Based on the relevant facts, no reasonable officer could believe that probable cause existed to arrest Butler for first-degree child cruelty. Butler's conduct—both known and reasonably

suspected—met neither the offense's act element nor its result element.

First, the act. A jury could rationally conclude that no reasonable officer could have believed that Butler "willfully deprive[d]" Jayden of anything, let alone the required "necessary sustenance." Remember, Butler gave Jayden a choice: Transfer to Salem and enjoy the benefits of bus service or remain at Rockdale with its attendant afternoon challenges. So, to the extent that Jayden was "deprive[d]" of a ride home, a jury could find it was a deprivation of his own making. There is also a question of fact as to whether Butler "willfully deprive[d]" Jayden of afternoon food or water. Viewing the evidence in the light most favorable to her, Butler at worst—at *worst*—failed to pack Jayden an afternoon snack and water bottle. But Jayden was a 17-year-old young man, not a small child. While Georgia courts have held that a parent can commit child cruelty by failing to feed a helpless infant, *see, e.g., Brown v. State*, 777 S.E.2d 466, 468 (Ga. 2015), the cases involving older children feature parents who actively prevent children from feeding themselves, *see, e.g., Nazario v. State*, 746 S.E.2d 109, 118 (Ga. 2013) (parent "bound and gagged the child, forced her into a bedroom closet, and dragged a dresser in front of the door so she could not escape"); *Franklin v. State*, 831 S.E.2d 186, 190–91 (Ga. 2019) (adoptive parents confined 15-year-old to a padlocked outhouse, chicken coop, or locked closet without food or water for as long as seven days).

Second, the result. Again, resolving all reasonable factual doubts in Butler's favor, a jury could rationally conclude that no reasonable officer could have found probable cause to believe that Jayden lacked "necessary sustenance"—as the Georgia courts have interpreted that phrase, "th[e] necessary food and drink which is sufficient to support life and maintain health." *Sanders*, 715 S.E.2d at 127. As an initial matter, it would be unreasonable to think that Jayden actually lacked food or water. Again, Jayden was 17 years old—and thus perfectly capable of packing himself a snack and filling up a water bottle. Moreover, even assuming that Jayden went without food and water during a four-hour window in the afternoons, there is no reason to think that so short a period left him without the necessaries to "support life or maintain health." Finally, and relatedly, Officer Smith's frequent lunches with Jayden, and their conversations about his ongoing attempts to "drop weight" for wrestling, suggested that he had more food than he needed.[6]

---

[6] None of Officer Smith's counterarguments move the needle. *See* Br. of Appellee at 25–28. First, even if Officer Smith claimed to believe that Jayden was missing meals, nothing before the magistrate judge remotely suggested as much. Second, Officer Smith's reliance on Jayden's supposed heart condition is misplaced; in order to avoid rendering the first-degree child-cruelty statute unconstitutionally vague, Georgia courts have routinely rejected reliance on health risks other than malnourishment and dehydration. *See, e.g.*, *State v. Lawrence*, 425 S.E.2d 280, 280–81 (Ga. 1993) (rejecting a theory based on depriving a child of oxygen). Finally, even if denying Jayden a house key could be deemed a "depriv[ation]," it certainly wasn't a *willful* one—it was merely a concerned mother's reasonable attempt to break her son's bad habit—about

22-11141                Opinion of the Court                27

Viewing these facts in the light most favorable to Butler as the non-moving party, this is not a close case. Based on the relevant information, a jury could reasonably find facts that would lead a reviewing court to conclude that Smith lacked even arguable probable cause to believe that Butler had committed first-degree child cruelty.[7]

**b**

The magistrate judge also issued an arrest warrant for felony second-degree child cruelty:

> Any person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain.

---

which Officer Smith knew but failed to disclose in her affidavits—of skipping school to hang out with friends.

[7] Of course, Smith can raise qualified immunity at trial, urge the jury to view the record as she has framed it, seek special interrogatories to resolve the historical facts underlying her immunity argument, and then resubmit the issue to the district court for decision. *See e.g., Simmons v. Bradshaw*, 879 F.3d 1157, 1164–65 (11th Cir. 2018) ("Where the defendant's pretrial motions are denied because there are genuine issues of fact that are determinative of the qualified immunity issue, special interrogatories may be used to resolve those factual issues. . . . We do not mean to imply, of course, that district courts should submit the issue of whether a defendant is entitled to qualified immunity to the jury. Qualified immunity is a legal issue to be decided by the court, and the jury interrogatories should not even mention the term. Instead, the jury interrogatories should be restricted to the who-what-when-where-why type of historical fact issues.").

Ga. Code Ann. § 16-5-70(c).  Criminal negligence is defined as "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby."  *Id.* § 16-2-1(b).

Based on the relevant information, viewed in the light most favorable to Butler, no reasonable officer could have thought that there was probable cause to believe Butler had either (1) committed the required act or (2) brought about the required result.  As to the act, Butler didn't herself "cause" Jayden any pain.  To the contrary, she accommodated Jayden's choice to remain at Rockdale.  That choice entailed difficulties, to be sure, but they can't—at least at summary judgment—be laid at Butler's feet.  So too with respect to the result—"cruel or excessive physical or mental pain."  In cases arising under Ga. Code Ann. § 16-5-70(b), which likewise prohibits causing a child "cruel or excessive physical or mental pain"—there, doing so "maliciously"—Georgia courts have interpreted what they have called the "pain element" to turn on factors such as "a child's age, the extent of injuries, the nature of the assault to which the child was subjected, and the force with which the child was struck."  *Moore v. State*, 656 S.E.2d 796, 799 (Ga. 2008).  None of those considerations even remotely suggests criminal liability in this case, and the first two—which apply equally to a "criminal[] negligen[ce]" case under § 16-5-70(c)—affirmatively counsel

against it: Jayden was a 17-year-old young man, and he suffered no discernible injuries.[8]

Again, given the particular facts before us, we don't think the question is particularly close: A jury could reasonably make findings that would lead a reviewing court to conclude that Officer Smith lacked even arguable probable cause to believe that Butler had committed second-degree child cruelty.

⋆   ⋆   ⋆

To recap our conclusion regarding Butler's Fourth Amendment malicious-prosecution claim: Applying the summary-judgment standard, we hold that, taken together, (1) the facts that Officer Smith included in the affidavits that she filed in support of the arrest warrants and (2) the material facts that she knew but omitted from those affidavits do not support even arguable probable cause to believe that Butler committed first- or second-degree child cruelty under Georgia law. Accordingly, we hold that Officer Smith is not entitled to qualified immunity, and we reverse the district

---

[8] To close the loop, any inference of criminally negligent infliction of "cruel or excessive" pain that might have arisen from the affidavits' misleading suggestions (1) that Jayden was once abandoned for a night and forced to stay with a friend and (2) that Butler forced Jayden to sit in a particular, exposed spot outside the school building to wait on her completely evaporate upon consideration of the material information that Officer Smith knew but failed to disclose. First, Butler's refusal to retrieve Jayden at his friend's followed straightaway from her policy—with which Officer Smith *agreed*—that she wouldn't pick him up from Brandon Glen; and second, Jayden in fact had several afternoon options—walk home, go to Pine Log Park, etc.

court's grant of summary judgment on Butler's Fourth Amendment claim.

## B

We can make relatively quick work of Butler's state-law malicious-prosecution claim. Georgia law provides a cause of action for "[a] criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted." Ga. Code Ann. § 51-7-40. The state-law claim's elements mirror the common-law portion of the federal claim, already discussed. *See Simpson v. State*, 715 S.E.2d 142, 145 (Ga. 2011) (noting that the state and federal probable-cause standards are substantially similar). Our explanation that the tort's constituent elements are satisfied applies equally to Butler's state-law claim. *See supra* at 11–21. And our determination that Officer Smith lacked even *arguable* probable necessarily means that she lacked *actual* probable cause. *See supra* at 21–29. That leaves only the issue of immunity.

Official immunity under Georgia law works a little differently from qualified immunity. Officials performing discretionary functions have immunity from personal liability unless "they act with actual malice or with actual intent to cause injury." Ga. Const. art. I, § 2, ¶ IX(d). Malice, here, is a "deliberate intention to do wrong." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999). Evidence of "frustration, irritation, and possibly even anger" or "proof of ill will" are insufficient, but ill will is enough when

"combined with the intent to do something wrongful or illegal." *Selvy v. Morrison*, 665 S.E.2d 401, 406 (Ga. Ct. App. 2008).

We hold that Butler has presented a genuine dispute about whether Officer Smith acted with "malice." Viewing the evidence in the light most favorable to Butler, Officer Smith had a close relationship with Jayden (she ate lunch with him, gave him money and a used bike), she felt disrespected at being called a "bitch" by Butler, she sought the arrest warrants very soon thereafter, seemingly without substantial additional investigation, and she inexplicably omitted material exculpatory information from her affidavits. Collectively, those facts give rise to a reasonable inference that Officer Smith didn't just make a mistake, but rather "knew that [Butler] had not committed the crimes" and harbored "ill will" and "personal animus" against her. *Wilson v. Cromer*, 847 S.E.2d 213, 217 (Ga. Ct. App. 2020).

## III

For the foregoing reasons, we **REVERSE** the grant of summary judgment on both claims and **REMAND** for further proceedings.

22-11141              ED CARNES, J., Concurring                    1

ED CARNES, Circuit Judge, concurring:

The Court's opinion addresses whether an officer's intentional or reckless failure to include in his affidavit, or otherwise disclose to a magistrate judge, known exculpatory evidence renders an arrest warrant constitutionally infirm. It does, the Court holds, if the omitted evidence is material, meaning that "had it been disclosed, [it] would have negated probable cause." Maj. Op. at 13. I agree with that holding, insofar as it goes, and join the opinion because it does not purport to hold that in making the materiality analysis a court shouldn't also consider undisclosed inculpatory evidence.

Deciding this case does not require us to address that issue, but some of our sister circuits have done so. The Second Circuit has held that when determining whether undisclosed exculpatory evidence renders an arrest warrant constitutionally infirm, a court should examine "*all* of the information the officers possessed when they applied for the arrest warrant." *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004) (emphasis added); *id.* at 744–45 (The question is whether, "if [the affiant] had included *all* she learned from her investigation, the application would have supported a reasonable . . . belief that probable cause existed.") (alteration adopted) (emphasis added) (quotation marks omitted); *see also Ganek v. Leibowitz*, 874 F.3d 73, 85 n.6 (2d Cir. 2017) ("Precedent instructs that, in applying the corrected affidavit doctrine, a court properly examines *all* of the information the officers possessed when they applied for the

2                        ED CARNES, J., Concurring                        22-11141

search warrant.") (alteration adopted) (emphasis added) (quotation marks omitted).

The Fifth Circuit agrees. In *Loftin v. City of Prentiss*, 33 F.4th 774, 782 (5th Cir. 2022), the plaintiff complained that the officer omitted material information from his affidavit in support of an arrest warrant. In the course of addressing that claim, the Fifth Circuit decided that the materiality of omitted exculpatory evidence requires considering any omitted inculpatory evidence as well. *Id.* at 782–83. It explained that is the proper approach because "a complete affidavit" would have included both the allegedly exculpatory information that was omitted as well as "other information that police gathered" that would have "only strengthen[ed] the already solid basis for probable cause." *Id.* at 782. In the *Loftin* case, consideration of the inculpatory omissions along with the exculpatory ones netted out to the conclusion that the omissions were not material; they did not render the warrant constitutionally infirm. *Id.* at 782–83; *see also Dempsey v. Bucknell Univ.*, 834 F.3d 457, 474 (3d Cir. 2016) ("In the normal course, the next step of our analysis would be to reconstruct the affidavit, including the recklessly omitted [exculpatory] information, so that we may proceed with a materiality analysis. In some cases, however, there will be other information in the record that gives context to or affects the weight to be accorded the recklessly omitted information, such that it also should be considered by the reviewing court in determining materiality.").