**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**MCMILLIAN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 25, 2019**

# In the Court of Appeals of Georgia

A19A0426. BARTLETT v. THE STATE.

MCMILLIAN, Judge.

Following a jury trial in February 2018, Ronnie Bartlett was convicted of one count of commercial gambling, one count of possession of a gambling device, and one count of keeping a gambling place. Bartlett now appeals, asserting that the trial court erred (1) in its charge to the jury; (2) in denying his motion for general demurrer and directed verdict of acquittal; (3) in denying his motion in limine to exclude certain evidence; and (4) in denying his motion to disqualify counsel. For the reasons that follow, we find the evidence was insufficient as a matter of law to support his convictions and therefore reverse.

Viewed in the light most favorable to the jury's verdict,[1] the evidence adduced at trial shows that Bartlett co-owned a restaurant called Captain Jack's Crab Shack ("Captain Jack's") in Byron, Georgia with his wife. Captain Jack's included both a dining area and a separate game room that contained nine coin operated amusement machines ("COAMs").[2] In early 2015, Detective Melanie Bickford of the Byron Police Department began investigating Captain Jack's following complaints of "illegal gambling." Bickford was assisted by Officer Christine Welch, who worked undercover during the investigation.

Bickford and Welch began their investigation by going to a gas station in another town to teach themselves how to play a COAM machine because neither had ever played before.[3] First, they inserted a twenty dollar bill into the machine, which gave them a certain amount of credits. They were then able to raise or lower how much they wanted to bet on each spin. The display screen had three digital slot-machine type wheels with pictures of fruits or numbers on them. They then hit a "spin

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[2] Customers were also allowed to eat and smoke in the game room.

[3] Bickford also watched YouTube videos depicting COAMs.

button" and another button to "nudge" the wheels up or down in order to make a winning combination.

After spending less than one hour to become familiar with the machines at the gas station, Welch went to Captain Jack's to play the COAMs there on six different dates in March and April 2015. Her mission was to secretly record portions of her play and attempt to receive cash payouts. On the first occasion, she put thirty dollars into the COAM.[4] After putting in the cash, she chose which game to play and then placed her wager, which had to be between twenty-five cents and five dollars. After spinning the wheels, she had to press a separate button to lower the wheels to make three matches across the middle of the screen. When she finished playing, she hit a button to end the play and then walked to a bar where someone handed her a certificate for the amount of credits she had earned. She then took the certificate to the cash register in the front of the restaurant where she received a two-dollar lottery ticket and the remaining amount in cash.

Welch returned two days later, played sixty dollars, and won one hundred ninety dollars. She was given a forty dollar certificate and a one hundred fifty dollar certificate. When she brought the certificates to the front, she received a two-dollar

---

[4] The State played the video recording of this visit for the jury.

lottery ticket, a five-dollar lottery ticket, and the remainder in cash. The third time, she played sixty dollars and cashed out with forty dollars, again receiving a two-dollar lottery ticket and the remainder in cash. This pattern continued at each of her visits. According to Welch, there were times that she won without having to hit the button to lower or raise the wheels, but she could not recall which of the nine COAMs it had happened on or how many times it had happened. One of the videos she recorded appeared to show another patron playing a COAM where she won without having to nudge the wheels.

On May 5, 2015, Byron police obtained a search warrant for Captain Jack's and Bartlett's personal residence. Five agents from the Georgia Lottery Commission were onsite during the search of Captain Jack's. Police seized the COAMs from Captain Jack's and approximately $24,000 in cash from Bartlett's home. Bartlett was ultimately charged in October 2016 with eight counts, including four counts of racketeering, one count of false writings, one count of commercial gambling, one count of possession of a gambling device, and one count of keeping a gambling place.

At trial, in addition to Welch's testimony regarding the COAM operations, the State presented the testimony of Karen Briscoe, who had frequented Captain Jack's over the years. Briscoe testified that she had played the COAMs and would redeem

4

her winnings for a combination of lottery tickets, meal vouchers, and cash. She also explained that as far as she could recall, she had always moved the wheels up or down in order to win and had never won without having to "nudge" the wheels.

Tony Williams, one of the Georgia Lottery Commission[5] ("GLC") inspectors present when law enforcement executed the search warrant at Captain Jack's, confirmed that Bartlett had a valid location license.[6] He also determined that between October 2013 and May 2015, $1,235,268 in cash was placed in the COAMs at Captain Jack's, and Bartlett reported a net profit of $398,176.[7] Following the

---

[5] The GLC began regulating COAMs in July 2013; prior to that time, COAMs were regulated by the Department of Revenue. Approximately 22,000 COAMs are certified and licensed to operate in Georgia by the GLC. Each machine is connected to a computer that monitors the money going into and out of the machines.

[6] Williams explained that a "master license holder" actually owns the machine whereas a "location license holder" enters into an agreement with a master license holder to use the machine. A single business cannot be both the master license and location license holder. To become a license holder, the business owner must apply to the GLC. The GLC also regulates and licenses the manufacturers of COAMs. Neither the master license holder nor the manufacturer of the COAMs at issue here were cited for any violations.

[7] The difference of $837,092 was the amount of redemption received by the players of the COAMs. The net profit is split, by law, with the master license holder, after the GLC takes five percent the first year, with the percentage to the GLC going up each year thereafter until a cap of ten percent.

inspection undertaken as part of the seizure, it was determined that the COAMs were operating only the appropriate types of games and displayed the required notices.

The State also presented the testimony of Christopher Edwards, an expert in forensic accounting, who testified that after examining Captain Jack's business records, he identified $4,400,000 in cash received via the COAMs from October 2013 through May 2015, with $2,400,000 unaccounted for in the records. He concluded that the COAM redemptions must have been paid out in cash.[8]

The State also introduced evidence of prior transactions through Sergeant Ashley Greer,[9] who testified that in 2010 he had previously investigated Captain Jack's to determine whether it was paying out cash redemptions. Through the use of a confidential informant, Greer determined that Captain Jack's had paid out between fourteen dollars and twenty-nine dollars in cash, along with a small sundry item, on three separate occasions. At the conclusion of his investigation, law enforcement

---

[8] Edward conceded on cross-examination, however, that he had not taken into consideration certain variables, such as the required split with the master license holder or the "cashless" ATM used in the restaurant. In addition, he included gross receipts from other local businesses owned by Bartlett in reaching his figures but did not use the Bartlett's individual tax returns in doing so.

[9] The trial court first gave a limiting instruction to the jury, explaining that the evidence was to be considered only for the purpose of proving Bartlett's intent.

seized approximately $3,000 in cash from the restaurant's register, but did not seize the COAMs or make any arrests before closing the case.[10]

The defense presented the testimony of several expert witnesses. Nick Farley, who owns one of the three independent testing laboratories used by the GLC, testified as an expert in electronic gaming testing, certification, and compliance. Farley explained that COAMs, by definition, have to have some skill. Before the GLC will consider granting a license, the COAM must be tested and certified by an independent testing laboratory. The testing ensures both that the game requires some skillful action on the part of the player and that it is communicating correctly with the GLC.

In this case, Farley examined the COAMs seized from Captain Jack's and found no evidence of tampering. He also performed an analysis of the software that was used in each of the COAMs. He confirmed that all of the games were "nudge games," meaning a game in which wheels spin and stop on a non-winning combination before the player identifies whether a winning combination is possible by moving one of the available wheels up or down to align the symbols in a winning

---

[10] A former Captain Jack's employee also testified that when she worked there in 2010, patrons who finished playing a COAM would print a ticket from the machine and bring it to her to get a gift certificate. They would then take the gift certificate to the front register, purchase something like lighters, candy, or food from the restaurant, and then receive the remainder of the certificate amount in cash.

pattern. Based on his analysis, none of the COAMs seized allowed for a winning combination without the player making some move to align the symbols.[11] He explained that when Welch thought she had played a winning combination without any further player input, what had actually occurred is that the game offered what is called a "bonus feature," which is presented as a free game or a continuation of play.[12] He was able to discern the "free game" symbol on the video Welch had recorded of her play.

Barlett also called Mark Nizdil to testify as an expert in the gaming industry. He explained that every COAM in the state continuously communicates data to the GLC, including how much money goes into the machine, the amount of plays that are made, and how many prizes are issued. Through his inspection, he determined that the games required some player assistance to make a winning combination. He explained that if anyone had attempted to manipulate the game in any way, the

---

[11] Bartlett also introduced copies of the documents certifying that the machines were bona fide COAMs.

[12] So in a game where the player nudged a symbol into a winning combination, the game will occasionally offer a bonus play and continue the play with no additional cost and then seemingly award a prize without further player interaction.

machine would have created a different signature number that would not connect to the GLC's required communication system.[13]

The jury convicted Bartlett of only the three commercial gambling charges. The trial court sentenced Bartlett to a total of five years, with two to be served in confinement. This appeal followed.

1. We turn first to Barlett's assertion that the trial court erred in denying his motion for directed verdict of acquittal on Counts 5, 6, and 7. We review the denial of a motion for a directed verdict of acquittal under the same standard as for determining the sufficiency of the evidence to support a conviction. *Smith v. State*, 304 Ga. 752, 754 (822 SE2d 220) (2018). "The evidence is sufficient as a matter of law if, when viewed in the light most favorable to the verdict, a rational trier of fact could find all the essential elements of the crimes charged beyond a reasonable doubt." (Citation and punctuation omitted.) *Pugh v. State*, 280 Ga. App. 137, 137 (633 SE2d 439) (2006).

---

[13] Bartlett also called John Corn, an expert in state and local taxation, to rebut the State's methodology in determining Captain Jack's accrual of sales and use tax. Corn concluded that Captain Jack's would not be required to accrue and remit to the State use tax resulting from its payment of cash as a redemption for the COAM gift certificates because cash is not tangible personal property.

Count 5 of the indictment charged Bartlett with committing the offense of commercial gambling in violation of OCGA § 16-12-22 (a) (1).[14] Count 6 charged Barlett with committing the offense of possession of a gambling device or equipment in violation of OCGA § 16-12-24 (a).[15] Count 7 charged Barlett with committing the offense of keeping a gambling place in violation of OCGA § 16-12-23 (a).[16] The State contended that the machines seized from Captain Jack's are "gambling devices," operated in violation of the commercial gambling statutes. Thus, the pivotal question is whether the seized machines are commercial gambling devices or COAMs.

As previously explained by our Supreme Court, commercial gambling is illegal in Georgia, but "OCGA § 16-12-35 creates an exception to Georgia's criminal laws

---

[14] OCGA § 16-12-22 (a) (1) provides that "[a] person commits the offense of commercial gambling when he intentionally . . . [o]perates or participates in the earnings of a gambling place[.]"

[15] OCGA § 16-12-24 (a) provides that "[a] person who knowingly owns, manufactures, transfers commercially, or possesses any device which he knows is designed for gambling purposes or anything which he knows is designed as a subassembly or essential part of such device is guilty of a misdemeanor of a high and aggravated nature."

[16] OCGA § 16-12-23 (a) provides that "[a] person who knowingly permits any real estate, building, room, tent, vehicle, boat, or other property whatsoever owned by him or under his control to be used as a gambling place or who rents or lets any such property with a view or expectation that it be so used commits the offense of keeping a gambling place."

10

against gambling for certain coin operated games and other devices designed and manufactured for bona fide amusement purposes only, which are comprehensively regulated by [a separate title of the Georgia Code] in OCGA §§ 50-27-70 to 50-27-104." *Gebrekidan v. City of Clarkston*, 298 Ga. 651, 656 (3) (a) (784 SE2d 373) (2016). OCGA § 50-27-70 (b) (2) (A) defines a bona fide coin operated amusement machine as:

> every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object *and the result of whose operation depends in whole or in part upon the skill of the player*, whether or not it affords an award to a successful play pursuant to subsections (b) through (g) of Code Section 16-12-35, and which can be legally shipped interstate according to federal law.

(emphasis added).

The State's theory at trial was that the COAMs in Captain Jack's were effectively converted into illegal gambling devices for two reasons. First, the State relied upon Welch's testimony that she was able to complete a winning spin without having to nudge the wheels, thus removing the element of player skill required of a bona fide COAM. In addition, the State asserted that because cash payments were

11

given to patrons in exchange for the certificates earned from the COAMs, the COAMs should be treated as illegal gambling devices. Both theories fail.

The State conceded at oral argument that there is no evidence that Bartlett tampered with the COAMs or otherwise did anything to remove the element of player skill. The commercial gambling offenses Bartlett is charged with are not strict liability crimes. Rather, they require that the defendant *intentionally* operate or participate in the earnings of a gambling place (OCGA § 16-12-22 (a) (1)), *knowingly* own or possess a device that he *knows* is designed for gambling purposes (OCGA § 16-12-24 (a)), and *knowingly* permit his property to be used as a gambling place (OCGA § 16-12-23 (a)). Thus, viewing the evidence in the light most favorable to the verdict, the State's evidence, at most, supported that the COAMs malfunctioned in some way to allow Welch to win without "nudging" the wheels. This is insufficient to show that Bartlett acted with the requisite criminal intent to support the commercial gambling charges.

Turning to the issue of whether the cash payments converted the certified COAMs into illegal gambling devices, OCGA § 16-12-35 (e) through (g) expressly governs the consequences for making cash payouts instead of the authorized rewards

12

listed in OCGA § 16-12-35 (d) (1).[17] See *Gebrekidan*, 298 Ga. at 657 (3) (a) ("It is a crime to misuse COAMs, such as by paying cash for successful plays, and there are numerous penalties for violating other provisions of the complex statutory scheme, such as provisions requiring the filing of reports. See OCGA §§ 16-12-35, 50-27-

---

[17] OCGA § 16-12-35 (d) (1) provides:

Nothing in this part shall apply to a coin operated game or device designed and manufactured only for bona fide amusement purposes which involves some skill in its operation if it rewards the player exclusively with:

(A) Free replays;

(B) Merchandise limited to noncash merchandise, prizes, toys, gift certificates, or novelties, each of which has a wholesale value of not more than $5.00 received for a single play of the game or device;

(C) Points, tokens, vouchers, tickets, or other evidence of winnings which may be exchanged for rewards set out in subparagraph (A) of this paragraph or subparagraph (B) of this paragraph or a combination of rewards set out in subparagraph (A) and subparagraph (B) of this paragraph; or

(D) Any combination of rewards set out in two or more of subparagraph (A), (B), or (C) of this paragraph.

13

85."). And OCGA § 16-12-35 plainly states that the misuse of a COAM by paying cash for winning plays constitutes a misdemeanor:[18]

(e) Any person who gives to any other person money for free replays on coin operated games or devices described in subsection (b), (c), or (d) of this Code section shall be guilty of a *misdemeanor*.

(f) Any person owning or possessing an amusement game or device described in subsection (c) or (d) of this Code section or any person employed by or acting on behalf of any such person who gives to any other person money for any noncash merchandise, prize, toy, gift certificate, or novelty received as a reward in playing any such amusement game or device shall be guilty of a *misdemeanor*.

(g) Any person owning or possessing an amusement game or device described in subsection (b), (c), or (d) of this Code section or any person employed by or acting on behalf of any such person who gives to any other person money as a reward for the successful play or winning of any such amusement game or device shall be guilty of a *misdemeanor* of a high and aggravated nature.

---

[18] A person who violates OCGA § 16-12-35 is also subject to having his or her COAM license revoked. See OCGA § 50-27-73 (c). In addition, OCGA § 16-12-35 (g.1) provides that anyone who commits multiple violations of out-of-store redemptions or redemptions for firearms, alcohol, or tobacco shall be guilty of a felony.

14

(emphasis added). Nowhere in OCGA § 16-12-35 does the General Assembly provide that a cash payout would convert an otherwise legal COAM into an illegal "gambling device" that would have subjected Bartlett to prosecution under OCGA §§ 16-12-22 (a) (1), 16-12-24 (a), or 16-12-23 (a).

Thus, where the State chose not to charge Bartlett with a misdemeanor under OCGA § 16-12-35 (e), (f), or (g), but instead elected to charge him under the commercial gambling statutes that COAMs are specifically exempted from, the evidence was insufficient as a matter of law to convict him of Counts 5, 6, and 7. Because the evidence is insufficient to enable a rational trier of fact to find Bartlett guilty beyond a reasonable doubt of the commercial gambling charges, it follows that the trial court erred in denying Bartlett's motion for a directed verdict of acquittal. See *Everritt v. State*, 277 Ga. 457, 460 (588 SE2d 691) (2003).

2. Based on our holding in Division 1, we need not reach Bartlett's remaining enumerations of error.

*Judgment reversed. McFadden, P. J., and Goss, J., concur.*