**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13535
Non-Argument Calendar

_____

JERRI MACRI,

REBECCA MACRI,

ZACHARY WHITE,

DALTHEA JO FORD,

    as executor of the estate of Danny White,

                              *Plaintiffs-Appellees-Cross Appellants,*

ALICIA WHITE,

    f.k.a. Alicia Lamb,

                              *Plaintiff-Appellee,*

*versus*

JAMES BROWER,

    Georgia Bureau of Investigation
    Special Agent,

SHANE MIMS,

    Agent for the Mid-South Narcotics Task Force,

                      *Defendants-Appellants-Cross Appellees,*

2                    Opinion of the Court                    24-13535

SHERIFF GENE SCARBROUGH,

  Tift County Sheriff, in his individual and
in his official capacity,

*Defendant.*

————————————

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-03240-SDG

————————————

Before JORDAN, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

In 1888, Chief Justice Bleckley of the Supreme Court of Georgia authored a famed two-sentence opinion:

> A social, genial gentleman, fond of company and a glass, by occupation a cigar–maker, who keeps his sleeping apartment with the doors "blanketed," in a fit condition for privately gaming therein, and who invites his friends at night to refresh themselves with beer, but has in the room, besides barrels and bottles, a table suitable for gaming, together with 11 packs of cards, and 2 boxes of "chips," one containing 80 chips and the other 300, and a memorandum book with names and numbers entered in it, and whose guests, or some of them, retire hurriedly under the bed on being surprised by a visit from the police at 1 o'clock in the morning, may or may not be guilty of the offense of keeping a gaming–house. A verdict of guilty, based on these and other inculpatory facts, such as the rattle of chips and money, and some expressions

> about $7 and $12, heard by the police on approaching
> the premises, is warranted by the evidence, and is not
> contrary to law.

*Pacetti v. State*, 7 S.E. 867, 868 (Ga. 1888). This case brings the rattle of coins, tokens, and cash into the twenty-first century and asks when Georgia law enforcement officers can be held liable for their misconception of Georgia's gambling laws. A pair of families—whose business was in coin-operated amusement machines—sued a number of Georgia law enforcement officers under 42 U.S.C. § 1983. This interlocutory appeal requires us to decide whether Georgia Bureau of Investigation Special Agent James Brower and Tift County Sheriff's Deputy Shane Mims are entitled to summary judgment based on qualified immunity from the families' complaint of malicious prosecution.

## I

The plaintiff-appellee/cross-appellant, Jerri Macri, is a businessman who lived in Enigma, Georgia. He and his business partner, Danny White, owned coin-operated amusement machines through a business called M&M Amusements.[1]

A coin-operated amusement machine is, for example, a pinball machine, a claw machine, an arcade game, a Skeeball machine, or an air hockey table if its "operation requires the payment of or

---

[1] Mr. White passed away during this litigation, and the executor of his estate was substituted as a party. In May of 2014, the name of M&M Amusements was changed to M&W Amusements. We use the name M&M Amusements herein for consistency with the language of the challenged arrest warrant affidavits.

the insertion of a coin, bill, other money, token, ticket, card, or similar object." O.C.G.A. § 50-27-70(b)(2)(A)(i), (v), (viii), (xv), (xvi). Coin-operated amusement machines are legal gambling machines regulated by the Georgia Lottery. A few Georgia rules governing coin-operated amusement machines are important to note at the outset. First, the owner of the machines must obtain a master license. Second, when the machine is placed in a place of business, the owner of that establishment must obtain a location license. Third, the owner of the establishment cannot also own the coin-operated amusement machine. Fourth, winnings from the machines cannot be paid in cash, and a successful play must be rewarded with store merchandise, store credit, or Georgia lottery tickets. Fifth, and finally, the master license holder and the location license holder must evenly divide the proceeds after an allocated percentage is paid to the Georgia Lottery.

Together, Mr. Macri and Mr. White placed their various coin-operated amusement machines in convenience stores throughout Tift County, Georgia. M&M held a valid master license for its machines. Mr. White's son—plaintiff-appellee/cross-appellant Zachary White (whom we'll refer to as Zachary)—helped his father's business in any way he could. This involved driving to the convenience stores, getting the proceeds from the machines, fixing the machines as needed, and retrieving receipts from the machines. Mr. Macri's then-wife, plaintiff-appellee/cross-appellant Rebecca Macri, also supported her husband's business—for example, by balancing ledgers. Lastly, plaintiff-appellee Alicia White, née Lamb, was Zachary's then-girlfriend and is now his wife. In early 2014, she

acquired a local gold-buying business called the Lucky Shamrock. The Lucky Shamrock had nine of M&M's coin-operated amusement machines inside for patrons to play.

During his 2012 campaign for Tift County Sheriff, incumbent Sheriff Gene Scarbrough received "complaints from citizens" that coin-operated amusement machine locations in Tift County were "illegally paying cash for winnings." D.E. 79-1 ¶ 10. *See also* D.E. 90-1. During this time, Deputy Sheriff Mims was assigned to the Mid-South Narcotics Task Force. The Mid-South Narcotics Task Force was an enforcement unit with local law enforcement officers from the Crisp, Turner, and Tift Counties' Sheriff's Offices. In addition to its namesake narcotics investigations, the Task Force also investigated "vice-related crimes" including illegal gambling. D.E. 77-1 ¶ 5. *See also* D.E. 85-1; D.E. 86.

Meanwhile, the Georgia Bureau of Investigation formed a Commercial Gambling Unit in August of 2013. Agent James Brower was a Special Agent with the GBI. That same month, August of 2013, these two agencies—the Task Force and the GBI—began collaborating on an investigation that led them to the Macris and the Whites.

The impetus of this investigation was a local store owner, who approached the Task Force and told them that M&M owned coin-operated amusement machines in convenience stores that paid cash winnings. And more importantly, the store owner told the Task Force that the owners of M&M instructed these convenience store owners to make cash payouts.

From there, the investigation was underway. From July of 2013 to July of 2014, agents regularly met with this store owner to collect the proceeds from the machines at his store and to record the proceeds retained by M&M. The investigation surveilled the Macris and the Whites and confirmed that Zachary collected proceeds from the machines to support his father's business during this time period. The Task Force also uncovered checks paid from M&M to Mrs. Macri for her work in support of her husband's business.

The investigation identified six different convenience stores where M&M owned machines and began controlled plays to see if they would be given cash payouts. On March 19, 2013, and April 17, 2013, an agent of the Task Force played the amusement machines at the Lucky Shamrock and was paid cash for his winnings. In December of 2013, an agent interviewed the then-owner of the Lucky Shamrock, and she stated that she paid cash to winners and that the owners of the machines "told her it was legal to pay cash and instructed her to do so." D.E. 79-1 ¶ 42. *See also* D.E. 90-1. An agent returned on January 16, 2014, played the M&M amusement machines, and received cash winnings. The joint task force continued to conduct these controlled plays and received cash payouts for wins at the five other locations on nine occasions spanning from March 20, 2014, to July 1, 2014. These agents also witnessed customers being paid cash for amusement machine winnings.

Special Agent Brower generally did not conduct undercover operations but rather focused his investigation on the M&M paper trail. Through his record searches, he discovered that, on January

15, 2014, Mrs. White applied for registration as a dealer in precious metals for the Lucky Shamrock. He also collected bank records showing that Mrs. White opened a small business account for the Lucky Shamrock on January 15, 2014. Lastly, he collected check deposit records showing that, in April of 2014, Mrs. Macri deposited five checks from M&M's operating account into her personal bank account.

On July 6, 2014, Deputy Mims swore to warrant affidavits to arrest Mr. Macri, Mr. White, Zachary, Mrs. White, and Mrs. Macri for commercial gambling. The warrants were issued by a Tift County magistrate judge. The following day, on July 7, 2014, they were each arrested and booked into the Tift County Jail.

When Mr. White was arrested, officers found cocaine and a burned marijuana cigarette. So on July 8, 2014, Deputy Mims swore out and obtained a second arrest warrant for Mr. White for the offenses of possession of marijuana and the possession of or manufacturing of schedule I or II drugs. The following day, on July 9, 2014, Mrs. Macri, Zachary, and Mrs. White were released on bond from the Tift County Jail.

On July 11, 2014, Deputy Mims signed affidavits to support additional arrest warrants for Mr. Macri, Mr. White, and Zachary for commercial gambling. A magistrate judge of Tift County issued the July 11 warrants. Zachary was arrested for a second time, and he bonded out of the jail on July 14, 2014. Mr. White and Mr. Macri were eventually released on bond in mid-to-late July of 2014.

On July 15, 2014, a Tift County grand jury indicted all five plaintiffs for charges of commercial gambling and conspiracy to

commit commercial gambling. Nearly six years later, in June of 2020, the district attorney decided to discontinue the prosecution due to the Georgia Court of Appeals' interpretation of the commercial gambling statutes, which we discuss later. The trial court entered a nolle prosequi on the pending charges.

On August 10, 2021, the Macris and the Whites brought this action against Sheriff Scarbrough, Deputy Mims, and Special Agent Brower. They asserted a malicious prosecution claim under 42 U.S.C. § 1983 and a state law conversion claim for the seizure of their property.

The parties filed cross-motions for summary judgment. Before us is the district court's denial of summary judgment to Deputy Mims as to the July 6 arrest warrants and Zachary's July 11 warrant; the district court held that Deputy Mims was not entitled to qualified immunity because he should have known the applications for the warrants for the plaintiffs' arrests lacked probable cause. Also on appeal is the denial of qualified immunity to Special Agent Brower as to the arrest warrant for Mrs. White. The district court held that there was sufficient evidence for a jury to conclude that Special Agent Brower provided Deputy Mims with misstatements to support Mrs. White's warrant.[2] The district court granted qualified immunity to Special Agent Brower for his involvement in the rest of the warrants and to Deputy Mims for the July 11 warrants

---

[2] The district court granted Sheriff Scarbrough qualified immunity based on his *de minimis* role in instituting or continuing the criminal prosecutions, and that issue is not presently before us. The court also dismissed the conversion claims, and that dismissal is likewise not an issue on appeal.

against Mr. Macri and Mr. White and denied the plaintiffs' motion for summary judgment.

## II

A district court's denial of summary judgment on the basis of qualified immunity is an immediately appealable collateral order if it solely concerns the pure legal decision of "(1) whether the implicated federal constitutional right was clearly established and (2) whether the alleged acts violated that law." *Koch v. Rugg*, 221 F.3d 1283, 1294 (11th Cir. 2000) (emphasis omitted).

We review *de novo* "a district court's disposition of a summary judgment motion based on qualified immunity, applying the same legal standards as the district court." *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003). "[W]e are required to resolve all issues of material fact in favor of the plaintiff." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (citing *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998)). "We then answer the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Id.* (quoting *Thornton v. City of Macon*, 132 F.3d 1395, 1397 (11th Cir. 1998)) (alterations adopted).

## III

To establish a malicious prosecution claim under § 1983, a plaintiff "must prove both 'a violation of his Fourth Amendment right to be free of unreasonable seizures' and 'the elements of the common law tort of malicious prosecution.'" *Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020) (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019)) (alterations adopted).

The elements of the common law tort of malicious prosecution are "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Paez*, 915 F.3d at 1285 (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)). The plaintiff "must prove that he suffered a seizure pursuant to legal process that violated the Fourth Amendment." *Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020). "To meet this burden, a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165. "A Fourth Amendment violation involving these seizures occurs 'when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements.'" *Id.* at 1158 (quoting *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)). "In these situations, legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement." *Id.* (alteration adopted) (internal quotation marks omitted).

Nevertheless, and notwithstanding a prima facie showing of these elements, the doctrine of qualified immunity shields a government official who perform discretionary functions from civil liability if she does not violate clearly established rights. *See, e.g., Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity allows "government officials to carry out their discretionary duties

without the fear of personal liability or harassing litigation." *Durruthy*, 351 F.3d at 1087 (citation omitted). In this Circuit, it shields "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

Where, as here, the parties do not quarrel over discretionary authority, we move to the two-part qualified immunity inquiry, asking "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and [ ] if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir. 2021) (internal quotation marks omitted). We may analyze these two prongs in any order. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *Underwood*, 11 F.4th at 1328. Qualified immunity will shield the defendant-official from civil liability if a plaintiff fails either prong of the analysis. *See Underwood*, 11 F.4th at 1328.

As its absence is an element of both the Fourth Amendment violation and the common law tort, "the presence of probable cause defeats a claim of malicious prosecution." *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016). "The doctrine of qualified immunity extends that latitude further, protecting an officer against liability provided that she had *arguable* probable cause." *Butler v. Smith*, 85 F.4th 1102, 1108 (11th Cir. 2023) (emphasis in original).

## A

We begin with Special Agent Brower. To prevail on a malicious prosecution claim against an official "who did not apply for the warrant," the plaintiffs must establish that the official

"intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Laskar*, 972 F.3d at 1296 (citation omitted). This requires a showing that the "official made false statements or omitted information either intentionally or in reckless disregard for the truth and that after deleting the misstatements, the warrant affidavit is insufficient to establish probable cause.'" *Id.* (alterations adopted) (internal quotation marks omitted). In other words, to survive summary judgment, Mrs. White must show that Special Agent Brower provided "materially false statements to support the arrest warrant." *Williams*, 965 F.3d at 1167.

It is undisputed that Special Agent Brower did not draft or swear to the warrant to arrest Mrs. White. Viewing the facts in the light most favorable to the plaintiffs, Special Agent Brower provided two bases for the warrant: (1) the material statement that, "On 01/15/2014 Alicia Lamb [n/k/a White] applied for a license for the Lucky Shamrock and has operated the business since that date. Lamb also opened a checking account for that business[;]" and (2) the general theory allegedly concocted by Special Agent Brower that the amusement machine owner can be charged with commercial gambling if the store owner made cash payouts to players. *See* D.E. 81-2 ¶ 61; D.E. 91-1 ¶ 62.

1

Special Agent Brower challenges the district court's determination that he intentionally or recklessly provided false information in support of Mrs. White's arrest warrant. We hold the district court erred by characterizing the evidence as to Mrs. White's ownership as "competing." D.E. 107 at 39. Critically, the question

is not simply whether Mrs. White actually owned the Lucky Shamrock when the January 16, 2014, cash payout was made; the correct inquiry is whether Special Agent Brower acted with intentional or reckless disregard for the truth when he relied on the license application submitted by Mrs. White to establish the date that she took over the business. *See Laskar*, 972 F.3d at 1296.

Some more background about the Lucky Shamrock is helpful. The Lucky Shamrock was a gold-buying business. The business' primary source of revenue, however, came from the nine coin-operated amusement machines inside the establishment. In 2014, Mrs. White acquired the Lucky Shamrock from a non-party, Sonya Howard. Mrs. White did not, however, purchase the business from Mrs. Howard; Mrs. Howard voluntarily transferred it without compensation because she just "wanted it out of her name." D.E. 71-1 at 59:15–24. This transfer occurred some time in early 2014, and for Mrs. White's part, was signified by Mrs. White "get[ting] the power transferred to [her] name[,]" and applying for "everything you're supposed to do." *Id.* at 18:17–19:8.

Mrs. White asserts that she "began" her "official ownership" of the Lucky Shamrock in February or March of 2014. D.E. 77-15 ¶ 8. Yet she listed herself as the "active manager of the business" on the application for registration as a dealer in precious metals reviewed by Special Agent Brower. *See* D.E. 81-3 at 25. The application, dated January 15, 2024, requested the "names of any other persons owning any interest in the operation of this business[,]" and Mrs. White listed none. *Id.* at 27. Mrs. White further confirmed that she had "obtained a business license from the governing

authority" for the Lucky Shamrock, and she swore to the truthfulness of this information. *See id.* The record is devoid of evidence (or inferences) showing how or why it was unreasonable to rely on Mrs. White's own sworn statement that no other person had an interest in operating the business on January 15, much less reckless or intentional to rely on it. *Cf. District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.") (internal quotation marks and citation omitted).

The plaintiffs claim that Special Agent Brower "knew that Mrs. White did not own the Lucky Shamrock on January 15, 2014, and discussed that fact in an e-mail." D.E. 77-1 ¶ 61. This statement is unsupported by the email even when viewing the facts in the light most favorable to the plaintiffs. The email states there was a location license issued to "Lucky Shamrock Buyers" from December 9, 2013, until March 20, 2014, as well as a location license for "Alicia Lamb" issued on February 25, 2014. *See* D.E. 81-3 at 30. The license for Lucky Shamrock Buyers had "no reporting at all." *Id.* This email does not state, or even imply, that Mrs. White did not own the Lucky Shamrock until February or March of 2014.

This email demonstrates only that the location license issued to the Lucky Shamrock entity temporally overlapped with the location license for Mrs. White personally from February 25, 2014, until March 20, 2014. [*Id.*] One can only speculate about how Special Agent Brower was expected to infer from the existence of the non-reporting Lucky Shamrock Buyers license that Mrs. White could *not* have owned the Lucky Shamrock as of January 15, 2014.

And, of course, mere speculation cannot avoid summary judgment. *E.g., Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (emphasis and citation omitted).

Because there is nothing in the record to transform this email into an affirmative indication that Mrs. White did not own or operate the Lucky Shamrock at the time of the controlled play on January 16, 2014, there is no evidence (or inference) of an intentional or reckless falsehood attributable to Special Agent Brower. This is not a case where the investigator "possessed information giving rise to an exculpatory inference but did nothing to examine the easily discoverable facts that would confirm or contradict that inference." *Gervin v. Florence*, 139 F.4th 1236, 1249 (11th Cir. 2025) (internal quotation marks and citation omitted). Indeed, Mrs. White still cannot pinpoint the exact date in early 2014 when she took over the business. Under the circumstances, Special Agent Brower reasonably relied on Mrs. White's own license application. Thus, Mrs. White has not established (or created an issue of fact) that Special Agent Brower committed a constitutional violation by stating that she owned the Lucky Shamrock as of January 15, 2014.

2

Next, we consider the plaintiffs' argument and examine Special Agent Brower's misunderstanding of the law—specifically, that making cash payouts constituted the crime of commercial gambling. As will be relevant below, this was also Deputy Mims' understanding of the law and theory of the case.

Qualified immunity protects a law enforcement officer if that officer had "a reasonable (even if mistaken) belief that a crime has been committed." *Butler*, 85 F.4th at 1108. *See also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity.") (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

The warrant charged Mrs. White with commercial gambling in violation of O.C.G.A. § 16-12-22. That statute provides that a "person commits the offense of commercial gambling when he intentionally . . . [o]perates or participates in the earnings of a gambling place[.]" A gambling place is an establishment principally used for "the playing of gambling devices." O.C.G.A. § 16-12-20(3). Gambling devices include:

> (A) Any contrivance which for a consideration affords the player an opportunity to obtain money or other thing of value, the award of which is determined by chance even though accompanied by some skill, whether or not the prize is automatically paid by contrivance;
> (B) Any slot machine or any simulation or variation thereof;
> (C) Any matchup or lineup game machine or device, operated for any consideration, in which two or more numerals, symbols, letters, or icons align in a winning combination on one or more lines vertically, horizontally, diagonally, or otherwise, without assistance by the player. Use of skill stops shall not be considered assistance by the player; or

(D) Any video game machine or device, operated for any consideration, for the play of poker, blackjack, any other card game, or keno or any simulation or variation of any of the foregoing, including, but not limited to, any game in which numerals, numbers, or any pictures, representations, or symbols are used as an equivalent or substitute for cards in the conduct of such game.

§ 16-12-20(2). Although there were nine coin-operated amusement machines at the Lucky Shamrock, the parties generally characterize them as Class B video game machines, which are those that "allow[ ] a successful player to accrue points on the machine and carry over points won on one play to a subsequent play or plays." § 50-27-70(b)(4).

The statutory scheme creates an exception for coin-operated amusement machines: "Nothing in this part shall apply to a coin operated game or device designed and manufactured only for bona fide amusement purposes which involves some skill in its operation if it rewards the player exclusively with[,]" essentially, noncash rewards. *Id.* § 16-12-35(d)(1). The law enforcement theory was that, if rewarded with cash payouts, an otherwise excepted, licensed coin-operated machine would become a gambling device by virtue of the exception's language requiring noncash rewards.

Nearly five years after the arrests in this case, the Georgia Court of Appeals decided *Barlett v. State*, 829 S.E.2d 187, 188 (Ga. Ct. App. 2019), and rejected the argument that the misuse of coin-operated machines constitutes commercial gambling because the "[e]xceptions to gambling law" provision of the statute, § 16-12-35,

provides for the exclusive penalties for cash payouts. Specifically, the subsections following the section upon which the defendants rely "plainly" state that the misuse of a coin-operated amusement machine by paying cash for winning is a misdemeanor. *See Barlett*, 829 S.E.2d at 192. *See also* § 16-12-35(e)–(g).

Despite that this is now the law of Georgia, we cannot say that the defendants' reading of the statute in 2014 was unreasonable. It is true that "[n]owhere in OCGA § 16-12-35 does the General Assembly provide that a cash payout would *convert* an otherwise legal [amusement machine] into an illegal 'gambling device[,]'" but the legislature's use of the word "if" in subsection (d)(1) nevertheless could be construed to align with defendants' reading. *See Bartlett*, 829 S.E.2d at 192–93 (emphasis added). Pre-*Barlett*, a reasonable law enforcement officer could read § 16-12-35(d)(1) to provide an exception to the definition of "gambling device" for "a coin operated game or device designed and manufactured only for bona fide amusement purposes which involves some skill in its operation" *only* "if it rewards the player exclusively with" free replays, store merchandise, or store credit. *See* § 16-12-35(d)(1). That the Georgia Court of Appeals declined to read the noncash rewards as a necessary precondition to the application of the exception does not make the defendants' reading in 2014 unreasonable. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("[T]he officers in this case cannot have been 'expected to predict the future course of constitutional law.'") (citation omitted).

Nor does the statute expressly make the misdemeanor the exclusive penalty for misuse of coin-operated amusement

machines. Thus, assuming without deciding that an officer who did not apply for the warrant can be exposed to malicious prosecution liability for his contribution to the theory of prosecution, qualified immunity protects Special Agent Brower's reasonable but mistaken read of § 16-12-35. As the district court noted, this conclusion is bolstered by the swath of cases in Georgia courts allowing this theory of liability to proceed against store operators.

In conclusion, there is simply no evidence that Special Agent Brower made a reckless or intentional misstatement regarding Mrs. White's ownership. Moreover, Special Agent Brower's incorrect understanding of the law was reasonable. Accordingly, qualified immunity shields Special Agent Brower.

**B**

Deputy Mims, the officer who applied for the warrants, challenges the district court's arguable probable cause determination as to each of the plaintiffs' arrest warrants for which he was denied qualified immunity. Specifically, the district court held that six warrants—supported by Deputy Mims' sworn affidavits—were not supported by arguable probable cause: (1) the July 6 arrest warrant against Mr. Macri, (2) the July 6 arrest warrant against Mr. White, (3) the July 6 warrant as to Zachary, (4) the July 11 warrant as to Zachary, (5) the July 6 warrant as to Mrs. Macri, and (6) the July 6 warrant against Mrs. White.[3]

---

[3] The plaintiffs cross-appeal the grant of qualified immunity to Deputy Mims as to (1) the July 11 arrest warrant against Mr. Macri and (2) the July 11 arrest warrant against Mr. White. We choose to exercise pendent appellate jurisdiction over the plaintiffs' cross-appeal because we are already reviewing

**1**

Because Deputy Mims applied for these warrants, "we consider only (1) the information that was before the magistrate, either . . . in formal affidavits or otherwise, minus (2) any material misstatements that [Deputy Mims] might have made, plus (3) any material information that [he] omitted from [his] affidavits." *Butler*, 85 F.4th at 1113 (citing *Paez*, 915 F.3d at 1287). Importantly, "probable cause in a malicious-prosecution claim challenging an arrest pursuant to a warrant can't be shown by reference to information in an officer's investigative file or mind absent a record that he submitted the file to or explained his thought processes to the magistrate judge." *Id.* (quoting *Luke v. Gulley*, 50 F.4th 90, 96 (11th Cir. 2022)) (alterations adopted and internal quotation marks omitted).

Deputy Mims argues this rule was not clearly established until our decision in *Williams*. 965 F.3d at 1162. This argument is foreclosed by our later cases' interpretation and application of *Williams*.

To begin, in 1971, the Supreme Court stated in *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971), that "[u]nder the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless." (citation omitted).

---

qualified immunity as to another of the July 11 warrant. *See Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016).

*Williams* noted that some of our decisions seemingly "look[ed] to 'the facts and circumstances within the [arresting] officer's knowledge'" when evaluating probable cause for a malicious prosecution claim. *See* 965 F.3d at 1163 (first citing *Wood*, 323 F.3d at 876, 878, 882; then citing *Carter v. City of Melbourne*, 731 F.3d 1161, 1166, 1170 (11th Cir. 2013); then citing *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010); then citing *Blue v. Lopez*, 901 F.3d 1352, 1359 (11th Cir. 2018); then citing *Lowe v. Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992)). The question is whether a reasonable officer in 2014 would be on fair notice that swearing to a deficient warrant violates the Fourth Amendment or whether these intervening decisions "injected uncertainty into the law" such that the contours of the malicious prosecution claim were not sufficiently clear. *See Reichle v. Howards*, 566 U.S. 658, 670 (2012).

*Williams* did not, and could not, overrule these cases indicating that we look to the officer's knowledge. Instead, it reconciled these decisions "by acknowledging a limited role for the arresting officer's knowledge in considering the constitutionality of warrant-based seizures" which we discuss below. 965 F.3d at 1164. Otherwise, it noted that the allegedly conflicting precedent applied the proper rule or "their discussions of the applicable standard for probable cause were dicta." *Id.* Thus, we conclude that these cases, reconciled by *Williams*, did not inject uncertainty into the contours of the Fourth Amendment right. Indeed, *Williams* itself did not find that this area of Fourth Amendment jurisprudence was sufficiently muddied to grant qualified immunity on the second prong; it

denied qualified immunity to the officer who made false statements in applying for a warrant in 2014. *See id.* at 1165.

Moreover, despite *Williams'* correction of some imprecise language, we have *never* held an officer may present woefully deficient factual matter to the magistrate judge and rehabilitate his or her affidavit later with facts when there is an overnight arrest pursuant to a warrant. Thus, we are unpersuaded that *Williams* announced a new previously unclear rule; it instead reaffirmed the "broad statement of principle within [*Whiteley*] that clearly establishes a constitutional right." *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc) (internal quotation marks and citation omitted).

This conclusion is bolstered by our caselaw applying this principle post-*Williams* to pre-*Williams* conduct. *See Laskar*, 972 F.3d at 1296 (denying qualified immunity based on *Williams'* "clarified" standard for conduct in 2010 in a 2020 decision); *Butler*, 85 F.4th at 1109 (denying qualified immunity based on this rule for 2017 conduct in a 2023 decision); *Gervin v. Florence*, 139 F.4th 1236, 1249 (11th Cir. 2025) (denying qualified immunity based on this rule for conduct in 2012 and 2019 in a 2025 decision). *See also Harris v. Hixon*, 102 F.4th 1120, 1134 (11th Cir. 2024) (explaining the clarification in *Williams* and using its rule to grant qualified immunity to an officer's 2019 conduct). Indeed, to hold otherwise would conflict with our precedent in *Luke*, evaluating a pre-*Williams* 2017 warrant application. 50 F.4th at 96. The panel expressly stated that it did "not consider in the calculus of probable cause that the detective relied on the investigative file and his intuition to identify [the

plaintiff] as a suspect because no record exists that he submitted the file to or explained his thought processes to the magistrate judge." *Id.* at 96. The panel explained why this right was clearly established in 2017:

> Under longstanding Supreme Court precedent, an officer must provide particular information to support an arrest warrant. *See Whiteley*, 401 U.S. at 564; *Franks v. Delaware*, 438 U.S. 154, 165 (1978). Our precedents agree—an officer who seeks an arrest warrant based on a "conclusory affidavit" that "clearly is insufficient to establish probable cause" is not entitled to qualified immunity. *Kelly v. Curtis*, 21 F.3d 1544, 1555 (11th Cir. 1994) (quoting *Garmon v. Lumpkin County*, 878 F.2d 1406, 1408 (11th Cir. 1989)). Here, no "reasonably competent officer" could have concluded that a warrant should issue based on the glaring deficiencies in the affidavit. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As a result, the unlawfulness of [the defendant-detective's] conduct was clearly established when he acted [in 2017] and he was not entitled to qualified immunity.

*Id.* at 97 (internal citations modified). We thus reject Deputy Mims' argument that we must consider the totality of the information known to him because his conduct occurred before 2020.

**2**

Even if we disagree about the clearly established law, Deputy Mims argues that we should consider the totality of the circumstances because there is an exception which "provides that if the period of detention after arrest is brief, information known to the

officers but not communicated to the judicial officer may be considered to uphold the seizure." *Harris*, 102 F.4th at 1134 (citing *Williams*, 965 F.3d at 1162–63). We have held that "a few hours" is a brief period of detention. *See id. See also Wood*, 323 F.3d at 876 (applying the exception to a four-to-five-hour detention). *Cf. Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975) (characterizing the time "to take the administrative steps incident to arrest" as "a brief period of detention").

Each plaintiff spent at least one night in the Tift County Jail on July 7, 2014, pursuant to the July 6 warrants. Mr. White was detained for one day pursuant to the July 6 warrants because, on July 8, 2014, the other arrest warrants issued for the drug possession charges.[4] Mrs. Macri, Zachary, and Mrs. White bonded out on July 9, 2014, so their period of detention was two days. Mr. Macri was detained for four days due to the July 6 warrants because, on July 11, 2014, the July 11 warrants issued. Thus, the plaintiffs were detained for anywhere between one night and four days pursuant to the July 6 warrants. Those periods are not brief. *See Harris*, 102 F.4th at 1134. Therefore, Deputy Mims' attempt to rehabilitate his affidavit with information in his mind and his investigative files—but not before the issuing magistrate—must fail. *See Williams*, 965 F.3d at 1162.

---

[4] It is of no consequence whether we measure the time before Mr. White's presumably constitutionally-justified detention on July 8 or the time before he paid his bond on July 17 because neither period is brief.

**3**

With those matters resolved, we analyze the arguable probable cause for each of the warrants. Probable cause exists if a reasonable officer could conclude that there was a substantial chance of criminal activity—and in a malicious prosecution case, a substantial chance of the charged criminal activity. *Turner v. Williams*, 65 F.4th 564, 581 (11th Cir. 2023); *Williams*, 965 F.3d at 1159–62. *See also Wesby*, 583 U.S. at 57. "The arguable-probable-cause standard asks whether a reasonable officer in the same circumstances and possessing the same knowledge as the [d]efendant could have believed that probable cause existed." *Butler*, 85 F.4th at 1116 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004) (alterations adopted and internal quotation marks omitted). "While an officer needn't prove every element of the charged crime, her knowledge that an element isn't met—or is exceedingly unlikely to be met—will preclude a finding of probable cause." *Butler*, 85 F.4th at 1116 (internal citations omitted).

**i**

The affidavit supporting Mr. Macri's July 6 arrest states, in full, as follows: "Jerry Macri did intentionally participate in the earnings of a gambling place, to-wit: he is the co-owner of M&M Amusement with Danny White and did collect his and Danny White[']s share of the profits for the Video Gambling Machines located at 1001 West 2nd Street Tifton, Georgia." D.E. 77-3 at 9. Viewing this brief sworn statement through the officers' mistaken but not unreasonable understanding of the law, it lacks any facts allowing a reasonable officer to conclude there was a substantial

chance of criminal activity. The alleged criminal activity turns on the fact that Mr. Macri instructed the store owners to make cash payouts, not that he or anyone else collected the share of profits from the machines. Without any mention of the cash payments, there is nothing to buttress the theory that the legal, licensed coin-amusement machines fell outside of the exception in § 16-12-35.

The mere characterization of the coin-operated amusement machines as video gambling machines also does not create a factual basis for the alleged commercial gambling operation. Thus, we affirm the district court's determination that this warrant was not supported by probable cause or arguable probable cause and affirm the denial of qualified immunity to Deputy Mims for Mr. Macri's malicious prosecution claim based on his July 6 arrest.

**ii**

The affidavit supporting Mr. White's July 6 arrest is nearly identical and reads: "Danny White did intentionally participate in the earnings of a gambling place, to-wit: he is the co-owner of M&M Amusement with Jerry Macri and did collect his and Jerry Macri[']s share of the profits for the Video Gambling Machines located at 1001 West 2nd Street Tifton, Georgia." D.E. 77-4 at 9. For the same reasons set out above, the cash payouts are fundamental to support probable cause or arguable probable cause under law enforcement's theory of the case. Accordingly, we affirm the district court's determination that this warrant was not supported by probable cause or arguable probable cause and affirm the denial of qualified immunity to Deputy Mims for this malicious prosecution claim by Mr. White.

### iii

The same flaw exists as to Zachary's July 6 arrest warrant. It states: "Zachary Leon White intentionally participate[d] in the earnings of a gambling place, to-wit: Zachary White is an employee of M&M Amusement and Zachary did collect the profits for the company from 1001 West 2nd street Tifton, Georgia." D.E. 77-5 at 8. Again, there is a complete absence of any facts that would allow any reasonable officer to conclude (or even mistakenly but reasonably conclude) that commercial gambling occurred because the warrant is silent as to the cash payouts.

Moreover, this warrant affidavit lacks even the characterization of the M&M machines as gambling machines and put only legal conduct before the issuing magistrate. We affirm the district court's determination that this warrant was not supported by probable cause or arguable probable cause and affirm the denial of qualified immunity to Deputy Mims for this malicious prosecution claim by Zachary.

### iv

To obtain the July 11 warrant as to Zachary, Agent Mims swore that "Zachary White did intentionally participate in the earnings of a gambling place, to-wit: The cashier[s] at [five different stores] paid [an undercover agent] [at least] $10.00 in cash for his winnings from a Gambling Machine." D.E. 77-5 at 2. The statement continues: "The store owners had been advised by Jerry Macri that it was ok to pay out cash and Jerry Macri, Danny White, and Zach

28                    Opinion of the Court                    24-13535

White were picking up the profits from said machines on a regular bases [sic]." *Id.*[5]

The district court held that this affidavit was insufficient to establish probable cause or arguable probable cause because there are no facts from which the knowledge of Mr. Macri telling the store owners to pay cash could be imputed to Zachary. Recall that while "an officer needn't prove every element of the charged crime, her knowledge that an element isn't met—or is exceedingly unlikely to be met—will preclude a finding of probable cause." *Butler*, 85 F.4th at 1116 (internal citations omitted). "We have never imposed 'a rigid requirement that an arresting officer must have specific evidence' of suspects' 'subjective intent' when their conduct 'otherwise gives rise to probable cause to arrest.'" *Davis v. City of Apopka*, 78 F.4th 1326, 1335 (11th Cir. 2023) (quoting *Gates v. Khokhar*, 884 F.3d 1290, 1300 (11th Cir. 2018)).

Putting aside the mistaken legal theory, there are not material misstatements made by Deputy Mims. Although the plaintiffs dispute the factual statement that the "store owners had been advised by Jerry Macri and Danny White that it was ok to pay out cash[,]" D.E. 77-5 at 1, they do not present evidence showing why Deputy Mims would have disbelieved the store owner who was the informant or "should have known that his application failed to establish probable cause." *Williams*, 965 F.3d at 1165. Indeed, the

---

[5] There are seven different warrants for five different establishments in which M&M had machines; the only difference in the language of the warrant affidavits is that one affidavit adds that Mr. White, in addition to Mr. Macri, said "it was ok to pay out cash." D.E. 77-5 at 1.

"[p]laintiffs do not dispute that the [July 11] warrant applications accurately reflected information the Task Force had uncovered" as of that date. *See* D.E. 107 at 44 (citing D.E.79-1 ¶¶ 93–94, 144–48; D.E. 90-1 ¶ 146). Likewise, the plaintiffs do not point to any material exculpatory information that Deputy Mims omitted from his affidavits. Instead, it is undisputed that Zachary helped his father's business by collecting proceeds from the convenience stores on at least twenty occasions during the course of the investigation. Collecting the proceeds involved visiting the convenience stores, clearing the data off the machines, retrieving the money from the storeowner, and giving it to Mr. Macri or Mr. White.

We cannot say that a reasonable officer would have known that drawing the inference that Zachary knew of the cash payouts due to his relationship to M&M would negate the constitutional validity of this warrant. The plaintiffs have not identified any evidence indicating that Deputy Mims had affirmative knowledge that the *mens rea* element was not met—that being, information that Zachary did not know, or could not have known, of the alleged scheme to tell store owners to make cash payouts. Such evidence would negate probable cause, but it does not exist on the record before us. Thus, we reverse the denial of qualified immunity to Deputy Mims as to the July 11 warrant with respect to Zachary.

v

The affidavit supporting the warrant for Mrs. Macri's July 6 arrest states, in full, as follows: "Rebecca Macri intentionally participate[d] in the earnings of a gambling place, to-wit: On April 1st, 8th, 16th, 23rd, and 28th of 2014, Rebecca Macri deposited a check

from Ameris Bank account 2048654418 in the amount of $460.00 each (totaling $2,300.00). Account 2048654418 was identified as an operating account in the name 'M&M Amusement.'" D.E. 77-6.

We affirm the district court's denial of qualified immunity as to this warrant affidavit because Deputy Mims "should have known that his application failed to establish probable cause." *Williams*, 965 F.3d at 1165. Unlike Zachary's July 11 warrant affidavit—from which a reasonable officer could infer that driving around to the convenience stores and interacting with the store owners who were illegally paying out cash implicated the arrestee in the scheme—here, the affidavit simply states that Mrs. Macri deposited five checks from her husband's business without indicating what those checks were for.

Like some of the other warrants, the affidavit for the July 6 warrant as to Mrs. Macri is devoid of facts concerning the cash payouts and, therefore, lacks a basis to conclude that commercial gambling occurred. Much less is there a substantial chance that Mrs. Macri intentionally participated in that commercial gambling because the affidavit does not factually support that anything illegal occurred. Clearly, "an affidavit does not support probable cause if it lacks *any* facts that suggest a crime occurred." *Williams*, 965 F.3d at 1167 (citing *Garmon*, 878 F.2d at 1410) (emphasis added). Depositing five checks does not create probable cause for the crime of commercial gambling. We affirm the district court's denial of qualified immunity on Mrs. Macri's claim against Deputy Mims.

**vi**

Next, we return to the Lucky Shamrock. Mrs. White's July 6 warrant affidavit reads:

> Alicia Lynn Lamb [n/k/a White] did intentionally participate in the earnings of a gambling place, to wit: On 01/15/2014 Alicia Lamb applied for a license for the Lucky Shamrock and has operated the business since that date. Lamb also opened a checking account for the business. The Lucky Shamrock contains numerous video gambling machines and makes cash payouts.

D.E. 77-7. The district court denied qualified immunity to Deputy Mims for the same reason as Special Agent Brower—that is, that Mrs. White's "ownership was a necessary predicate to arguable probable cause." D.E. 107 at 40. As we explained above, Special Agent Brower did not act with intentional or reckless disregard for the truth when he relied on the license application to establish the date that Mrs. White took over the business. *See Laskar*, 972 F.3d at 1296.

Although it does not necessarily follow that Deputy Mims had probable cause, the plaintiffs have not presented another reason why Deputy Mims "should have known that his application failed to establish probable cause." *Williams*, 965 F.3d at 1165. Even viewing the facts in the light most favorable to the plaintiffs, Deputy Mims did not present falsehoods to the magistrate judge by relying on Mrs. White's own sworn statement that no other person had an interest in operating the Lucky Shamrock as of January 15. Further, interpreting O.C.G.A. § 16-12-35 to make the noncash

rewards a necessary condition for the exception to apply and declining to interpret the misdemeanor penalties as the exclusive punishment for cash payments is a reasonable though mistaken read of the statutory scheme. Unlike the other deficient affidavits for the July 6 warrants, this warrant affidavit plainly contains the fact that Mrs. White's establishment made cash payments as winnings for the amusement machines. For these reasons, we reverse the district court's denial of summary judgment to Deputy Mims for Mrs. White's malicious prosecution claim.

### vii

The July 11 warrants for Mr. Macri and Mr. White are nearly identical to the July 11 warrant for Zachary. Agent Mims swore that Mr. Macri and Mr. White "did intentionally participate in the earnings of a gambling place, to-wit: The cashier[s] at [five different stores] paid [an undercover agent] [at least] $10.00 in cash for his winnings from a Gambling Machine." D.E. 77-3 at 1; D.E. 77-4 at 1. The statement continues that "[t]he store owners had been advised by Jerry Macri that it was ok to pay out cash and Jerry Macri, Danny White, and Zach White were picking up the profits from said machines on a regular bases [sic]." D.E. 77-3 at 1; D.E. 77-4 at 1.[6]

---

[6] For each man, Mr. White and Mr. Macri, there are eight different warrants for five different establishments in which M&M Amusement had machines and for several different dates of the alleged payments. Four of the sixteen affidavits aver that Mr. White, in addition to Mr. Macri, said "it was ok to pay out cash." D.E. 77-3 at 7–8; D.E. 77-4 at 7–8.

Like Zachary's strikingly similar July 11 warrant affidavits, this affidavit establishes arguable probable cause because it offers factual support for the theory that cash payments excluded the coin-operated machines from the exception and that Mr. Macri and Mr. White participated in the earnings from the plays paid out by cash rewards. Because "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983), Deputy Mims' reliance on the informant and the nine different visits to these establishments by undercover agents where those agents received cash is sufficient to hold that the information before the magistrate supported a probable cause finding.

Setting aside the mistaken legal theory, the plaintiffs have not provided evidence to support any inculpatory material misstatements (or inferences of the same) by Deputy Mims based on his investigation. Nor have they set forth any exculpatory material information that he omitted from his affidavits. Thus, we affirm the district court's grant of qualified immunity as to the July 11 warrants.

## IV

We affirm the district court's grant of qualified immunity to Deputy Mims for the July 11 warrant affidavits with respect to Mr. Macri and Mr. White and affirm the denial of qualified immunity to Deputy Mims for the July 6 warrant affidavits as to Mr. Macri, Mr. White, Mrs. Macri, and Zachary. We reverse the district court's denial of qualified immunity to Deputy Mims for the July 6 warrant affidavit as to Mrs. White and the July 11 warrant affidavit

as to Zachary. We reverse the district court's denial of qualified immunity to Special Agent Brower for the July 6 warrant affidavit as to Mrs. White.

**AFFIRMED in part, REVERSED in part, and REMANDED.**