**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 23-13252

————————————

JAKETRA BRYANT,
on behalf of MINOR CHILD,

Plaintiff-Appellant,

*versus*

CALVARY CHRISTIAN SCHOOL OF COLUMBUS GEORGIA INC,

Defendant-Appellee.

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 4:21-cv-00205-CDL

————————————

Before JORDAN and JILL PRYOR, Circuit Judges, and MORENO, District Judge.[*]

PER CURIAM:

Jaketra Bryant's minor son, C.B., was enrolled in Calvary Christian School's Discovery Program in 2019 during his sixth grade year. The Discovery Program is suited for students with learning differences who attend Calvary, a private school in Columbus, Georgia. C.B. was diagnosed with autism spectrum disorder and attention deficit hyperactivity disorder, both of which necessitated some accommodations in the classroom environment provided through a Student Support Plan tailored to his needs. In the seventh grade, C.B. engaged in a series of outbursts that led to disciplinary action, culminating in his dismissal from Calvary.

Ms. Bryant then filed the instant lawsuit, alleging that Calvary discriminated against C.B. on the basis of race by creating a hostile education environment in violation of Title VI and illegally disciplining him for his outbursts in violation of 42 U.S.C. § 1981. She also asserted disability discrimination and disparate treatment based on Calvary's failure to accommodate C.B.'s disability under the Rehabilitation Act.

The district court granted summary judgment for Calvary on all claims, finding no racial or disability discrimination. Ms. Bryant appealed. After review of the record and the parties' briefs, and

---

[*] Honorable Federico Moreno, United States District Judge for the Southern District of Florida, sitting by designation.

23-13252                Opinion of the Court                3

with the benefit of oral argument, we affirm the district court's summary judgment order.

## I

C.B., a Black child, enrolled at Calvary in August of 2019 as a sixth grader. Ms. Bryant entered into a contract with Calvary, paying $7,800 in tuition for the 2019 to 2020 school year.[1]

On September 5, 2019, C.B. was diagnosed with autism and attention hyperactivity deficit disorder (ADHD) by a clinical psychologist, Dr. Kevin Weis. Dr. Weis provided Ms. Bryant with a report and recommendations for C.B.'s learning needs, and Ms. Bryant submitted his recommendations to Calvary. Dr. Weis recommended classroom accommodations and a behavior plan that would support C.B. and help him reach his academic potential. Based on Dr. Weis' report, C.B. was enrolled in Calvary's Discovery Program, which was designed to serve students with "learning differences." Some students in the Discovery Program had Individualized Education Programs (IEPs) or plans pursuant to § 504 of the Rehabilitation Act (504 Plans), but C.B. had neither an IEP nor

---

[1] We view all of the record evidence in the light most favorable to Ms. Bryant and resolve all conflicts in her favor. But, "[a]ll material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted," pursuant to Local Rule 56 of the Middle District of Georgia. Where Ms. Bryant fails to controvert Calvary's undisputed facts with record evidence supporting her contentions, there is no conflict to resolve in her favor and we consider those facts as admitted. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302–03 (11th Cir. 2009).

a 504 Plan while participating in the program.  Instead, Calvary developed a Student Support Plan with accommodations for C.B. based on Dr. Weis' recommendations.

Later that year, the Discovery Program director, Pamela Jones, suggested to Ms. Bryant that C.B. receive Applied Behavioral Analysis (ABA) therapy.  But Ms. Bryant did not enroll him in ABA therapy at that time.

C.B. began struggling at Calvary in the seventh grade.  His teacher, Kelly Cameron, received C.B.'s Student Support Plan and integrated it into her classroom environment.  In September of 2020, C.B. began acting out in class.  In one instance, after being told to stop playing a game on his laptop, C.B. slammed his laptop down hard during class.  One month later, C.B. threw a pencil in the classroom, where other students were present.  After this incident, C.B. was suspended by Calvary's headmaster, Jim Koan, for three days.  Ms. Jones then spoke with Ms. Bryant, saying that C.B. should be enrolled in ABA therapy and that he should be evaluated for medication.

Around this time, C.B. told his mother about comments his peers had made at school.  Ms. Bryant then reported those comments to Ms. Jones.  These comments included statements by other students that "God hat[es] black people" and "God hat[es] gay people," which especially concerned Ms. Bryant because C.B. was a Black student.  In a meeting five days after C.B.'s pencil-throwing incident, Ms. Jones told Ms. Bryant to be careful with C.B. or "he might end up with his hands behind his back."  Ms. Bryant felt this

comment assumed C.B. would engage in criminal behavior because of his race.

After returning from his three-day suspension, C.B. threw a calculator into a wall in the classroom setting, breaking it. Mr. Koan then required that C.B. complete the school year virtually. Ms. Cameron met with C.B. twice a week online and found that he had difficulty paying attention in class and often missed required sessions, which Ms. Bryant asserted was the result of Ms. Cameron's inconsistency in sending the link to the virtual sessions. Ms. Bryant later complained about Ms. Cameron's decision to record C.B.'s outbursts as misbehavior, rather than viewing them as manifestations of his learning needs. She asked that C.B. be removed from Ms. Cameron's class and moved into a different class with a teacher who would implement Dr. Weis' recommendations and reinforce positive behavior.

In December of 2020, Mr. Koan notified Ms. Bryant that C.B. would not be allowed to return to Calvary for in-person instruction unless he completed ABA therapy at another school or in another classroom setting. He cited C.B.'s property destruction, Ms. Bryant's failure to enroll C.B. in ABA therapy or evaluate him for assistive medication, and C.B.'s continued difficulty and misbehavior in the virtual classroom setting.[2]

---

[2] In an e-mail to Ms. Bryant dated December 2, 2020, Mr. Koan wrote: "Calvary will be happy to have [C.B.] complete this semester remotely, but I am afraid I must insist that before [C.B.] returns to the Calvary classroom, [he]

6                    Opinion of the Court                    23-13252

Ms. Bryant then met a behavioral analyst, Kya Williams, to pursue ABA therapy for C.B.  C.B. was allowed to take his virtual classes at Ms. Williams' behavioral clinic, which had a classroom setting.  Ms. Bryant believed that Mr. Koan would allow C.B. to return in person as early as February of 2021.

After observing and assessing C.B., Ms. Williams provided an evaluation report and recommendations for behavioral therapy support services, which Ms. Bryant presented to Calvary.  Ms. Williams and Ms. Bryant met with Calvary representatives in December of 2020 and February of 2021 to suggest accommodations for C.B. to reenroll at the school and return to in-class instruction at Calvary.  Those proposed accommodations were that C.B. would resume in-person instruction at Calvary accompanied by an in-school ABA assistant who would support C.B. and train Calvary staff in techniques to implement his therapy plan.

Mr. Koan notified Ms. Bryant that the therapy plan as suggested by Ms. Williams could not be accommodated because C.B. could not return to Calvary for in-person instruction until Calvary received a report of his progress in ABA therapy in an alternative classroom setting.  Some time thereafter, Ms. Bryant failed to respond to further communications in February of 2021, and Calvary

---

will need to complete the ABA therapy.  Since it is necessary for the ABA therapy to include classroom observation by the therapist, [he] will need to enroll in a public school or another classroom setting for 2nd semester.  It will not be possible for [C.B.] to enroll in Calvary's [virtual learning] for 2nd semester."  D.E. 59-15 at 2.

treated C.B. as "withdrawn as a student." In April of 2021, C.B. enrolled in classes at Sylvan Academy, where he since received good grades and had no significant disciplinary violations.

## II

We review a district court's summary judgment order *de novo*, and we view the evidence in the light most favorable to Ms. Bryant, the non-movant. *See Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1177 (11th Cir. 2020) (internal citation and quotation marks omitted).

## III

Title VI of the Civil Rights Act of 1964 guarantees that "[n]o person in the United States shall, on the ground of race . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. We recently adopted the deliberate indifference standard applied in Title IX cases to Title VI claims, under which a plaintiff must prove the discrimination was intentional, and intentional discrimination can be proven through a history of discriminatory official actions or deliberate indifference to harassment. *See Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1273 (11th Cir. 2023) ("[A] school district engages in

intentional discrimination and is liable under Title VI when it is deliberately indifferent to known acts of student-on-student racial harassment.").  A school is deliberately indifferent to harassment where it has "actual knowledge" of harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the [student] of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  Whether the harassment is severe, pervasive or objectively offensive depends on (1) its frequency, (2) its severity, (3) if the conduct is threatening or humiliating, and (4) if the conduct unreasonably interferes with the student's education.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc).[3]

Ms. Bryant argues that C.B. was subjected to racial discrimination because Calvary was deliberately indifferent to the hostile educational environment fostered at the school. *See Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1284–85 (11th Cir. 2003).  She contends that both Calvary students and staff harassed C.B. with their statements, microaggressions, and treatment in the classroom.  She also asserts that Calvary had actual knowledge of pervasive racial harassment because she made Calvary officials aware of the alleged discriminatory incidents C.B. faced, and that officials "did nothing" to counteract them.  And she believes that because

---

[3] "Title VII standards [are] instructive in Title VI case[s]." *Ga. State Conf. of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985) (citing *NAACP v. Medical Center Inc.*, 657 F.2d 1322, 1331 (3d Cir. 1981) (en banc)).

the school officials did not respond to her complaints, their inaction rose to the level of deliberate indifference. *See Davis*, 526 U.S. at 654.

The district court concluded that the alleged conduct by students and staff did not deny C.B. equal access to education, although the comments made by the other students were offensive. We agree.

The comments made by C.B.'s peers—that God hates Black people and gay people—are certainly offensive. But we view those comments through the prism of the circumstances in which they arose, and we conclude that they do not rise to the level of harassment sufficient to establish a hostile educational environment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.") (internal quotation marks and citation omitted); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."). The distinction between actionable harassment and schoolyard teasing depends in part on the social context and the period of time involved, through which a factfinder can "distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 82.

In *Fennell v. Marion Independent School District*, 804 F.3d 398 (5th Cir. 2015), the Fifth Circuit concluded that a hostile educational environment existed where some students had targeted fellow student with racial slurs and epithets over the course of many years, with the first occurrences alleged to have occurred in kindergarten. *See id.* at 402. The Fifth Circuit explained that harassment that is "severe, pervasive, and objectively offensive" under *Davis* would need to "be more than the sort of teasing and bullying that generally takes place in schools." *See id.* at 409 (internal citation omitted). In that case, the repeated use of racial slurs, the use of a noose with an accompanying written note full of racial epithets, and racist attacks made at another student at the school were facts that demonstrated the educational environment was sufficiently severe as to prevent the plaintiffs from access to an equal education. *See id.* And, these incidents were "sufficiently regular and continuous" to establish pervasive harassment. *See id.* at 409–10.

None of the facts in this case rise to the level of harassment displayed in *Fennell*, which Ms. Bryant cited as a benchmark for harassment that would be "severe, pervasive, and objectively offensive" under *Davis*. *See* Appellant's Br. at 44. The offensive student comments here were not directed at any particular individuals at the school (including C.B.) as threats or humiliation, did not include racial epithets or slurs, and occurred twice over the course of C.B.'s year at Calvary. In this factual context, those comments, although offensive, were not frequent, threatening or humiliating, and ultimately did not interfere with C.B.'s education.

Additionally, Ms. Bryant points to comments made by staff, including Ms. Jones telling her that C.B. should be careful or he "would end up with his hands behind his back" based on his behavioral outbursts and repeated suggestions that she evaluate him for medication, to establish actionable harassment. These singular comments, however, were made to Ms. Bryant and not to C.B. or in the classroom setting. Not only were these comments infrequent and less severe than the student comments, C.B. never experienced them such that they would interfere with his ability to learn in the educational environment at Calvary. Instead, those comments could reasonably be attributed to staff members notifying Ms. Bryant of her son's behavior and the risks associated with that in the school disciplinary context, and suggestions that she consider medication for C.B. based on his varied learning needs and difficulties. In her brief on appeal, Ms. Bryant acknowledges "[t]hat Calvary wanted [her] to look into having [C.B.] medicated shows that *Calvary* thought the root of C.B.'s disputed behavior was a disability." Appellant's Br. at 19. This alternative explanation reasonably demonstrates that staff comments did not create a hostile educational environment. Taking all of the facts into consideration on this record, in light of the social context, the alleged conduct was infrequent and not sufficiently severe to establish a hostile educational environment for C.B. under Title VI.

## IV

Under 42 U.S.C. § 1981, individuals have equal rights under the law "to make and enforce contracts[.]" As relevant here, § 1981 covers contracts entered into by a private school and a student and

his family.  *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999); *Runyon v. McCrary*, 427 U.S. 160, 172–73 (1976).  To prove a racial discrimination claim in violation of § 1981, a plaintiff must show intentional discrimination through direct or circumstantial evidence.  *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (en banc) (*Lewis I*).  To avoid summary judgment, Ms. Bryant had to present sufficient evidence to create an issue of fact on this issue.

Ms. Bryant must first make a prima facie case of racial discrimination.  *See id.* at 1220.  *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The *McDonnell Douglas* framework and "convincing mosaic" approach are "two ways to meet the same summary judgment standard: enough evidence for a reasonable jury to conclude that illegal discrimination occurred." *McCreight v. AuburnBank*, 117 F.4th 1322, 1326 (11th Cir. 2024).

## A

Applying the *McDonnell Douglas* framework, Ms. Bryant needs to show "(1) that [C.B.] belongs to a protected class, (2) that [he] was subjected to an adverse . . . action, (3) that [he] was qualified [to attend Calvary], and (4) that [Calvary] treated 'similarly situated' [students] outside his [racial] class more favorably." *Lewis I*, 918 F.3d at 1220–21.  If she succeeds in establishing a prima facie case of discrimination, then the burden shifts to Calvary to present a nondiscriminatory reason for the adverse action.  *See id.* at 1221.  Finally, if such a reason is articulated, then Ms. Bryant would need

to show (or create an issue of fact) that nondiscriminatory reason was pretextual for prohibited discrimination. *See id.*

Our inquiry begins and ends at the first step of the *McDonnell Douglas* framework because Ms. Bryant cannot establish on this record that similarly situated comparator students were treated more favorably than C.B. A comparator "must be sufficiently similar" to the plaintiff in order to be "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1228 (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)); *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 868 (11th Cir. 2025) (quoting *Lewis I*, 918 F.3d at 1226). Here, that would be a student who has "engaged in the same basic conduct (or misconduct) as [C.B.]" under the same disciplinary policy, and who shares C.B.'s "disciplinary history." *Lewis I*, 918 F.3d at 1227–28.

Ms. Bryant has presented no comparator student outside C.B.'s racial class who was treated differently from which we could infer that Calvary intentionally discriminated against her son. She attempted to establish a comparator who she says physically attacked the principal but was not suspended or dismissed for that behavior; that student was permitted ABA services and later allowed to graduate from Calvary. Critically, however, Ms. Bryant does not allege that this comparator was a member of a different racial class than C.B. She also cannot point to any evidence that this student received milder disciplinary treatment than C.B., given that his condition improved with ABA services that were also offered to C.B. by Calvary.

Ms. Bryant's second attempt to establish a comparator student similarly fails to satisfy this requirement of *McDonnell Douglas*. Ms. Bryant points to two white students who made racist comments during a meeting but were not dismissed from the school. But, these comments do not constitute "the same basic conduct (or misconduct)" as C.B., who was disciplined for his outbursts. Ms. Bryant did not show that these students had the same "disciplinary history" as C.B. even though their comments were also disruptive. As a result, we do not proceed with our analysis beyond the first step of *McDonnell Douglas* because Ms. Bryant failed to present a comparator that was similarly situated in all material respects to establish a prima facie case of discrimination.

As Ms. Bryant points out, we reasoned in *Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023), that failure to make out a prima facie case under *McDonnell Douglas* often, but not always, means the plaintiff is unable to prove discrimination. *See id.* at 945–46. Ms. Bryant has "fail[ed] to produce a comparator" but could yet survive summary judgment if she "presents circumstantial evidence that creates a triable issue concerning [Calvary's] discriminatory intent." *Id.* at 946 (internal citations and quotation marks omitted). We turn to that matter next.

**B**

Without comparator evidence, Ms. Bryant could still succeed on her § 1981 claim by presenting "evidence to show that discrimination played any part in the decision-making process" through "a convincing mosaic of circumstantial evidence that

warrants an inference of intentional discrimination." *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 997 (11th Cir. 2025) (internal citations and quotation marks omitted). Such a convincing mosaic involves "a variety of evidence which collectively strongly suggests that [Calvary's] decisions were based on [C.B.'s] race[.]" *Id.* (internal citation and quotation marks omitted). The convincing mosaic theory is a different analytical approach than *McDonnell Douglas* but seeks to answer the same ultimate question—"whether there is enough evidence to show that the reason for an adverse [disciplinary] action was illegal discrimination." *Tynes*, 88 F.4th at 941. *See also McCreight*, 117 F.4th at 1335 ("[The convincing mosaic approach] is also a helpful reminder that *McDonnell Douglas* is not the only game in town—a particularly useful point for [students] with significant evidence of illegal discrimination who lack the comparator evidence often required to set out a case under *McDonnell Douglas*.").

A convincing mosaic of evidence may involve evidence of "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated [students], and (3) that the [school's] justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*) (internal citation and quotation marks omitted). Such evidence must ultimately "create[ ] a triable issue concerning the [school's] discriminatory intent" in order to survive summary judgment. *See id.* (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

To attempt to raise suspicion of discriminatory intent, Ms. Bryant points to her personal observations that other students made racist remarks in class, that C.B. was treated differently than white students, that Calvary teachers were sarcastic and patronizing to her, that teachers failed to respond to other students' racist remarks, and that teachers made comments implying C.B. was dangerous to others. But neither other students' comments, though undoubtedly offensive, nor Ms. Bryant's general assertion that "teachers did not take the time to address those things" adequately supports an inference of the school administrators' discriminatory intent. Nor do Ms. Bryant's observations that teachers may have spoken slowly to C.B., ignored him, or answered questions for other students differently. This conduct could reasonably be attributed to the students' various individual learning needs or to the imperfections of virtual instruction. They do not raise a suspicion of discriminatory intent with respect to Calvary's response to C.B.'s misconduct. And, as noted above, the comments regarding C.B.'s danger to others could reasonably be attributed to staff members notifying Ms. Bryant of her son's behavior and the problems it could pose to other students. Indeed, Ms. Bryant admits that Calvary viewed C.B.'s actions as harmful to a sense of classroom security. That Calvary teachers conveyed that concern to her and to C.B. does not raise a suspicion of discriminatory intent that avoids summary judgment.

Ms. Bryant also points to Calvary's recordkeeping as to C.B.'s disciplinary history. She references an internal document tracking C.B.'s misconduct while enrolled at Calvary, which

includes more incidents of misbehavior and outbursts than were formally included in Calvary's academic portal. Ms. Bryant alleges that the formally reported incidents were recorded around the same time that she complained about racial discrimination to the school. Importantly, Ms. Bryant does not dispute that any of these instances of misbehavior—informally or formally recorded—were falsified or did not occur. Ms. Bryant's attempt to question Calvary's motive for formally recording certain instances of C.B.'s undisputed misconduct does not establish a genuine issue of material fact for a jury to consider.

Ms. Bryant also argues that Calvary's justifications for disciplinary action were pretext for unlawful discrimination. She contends that the proffered explanations show that Calvary disregarded its own policies, exaggerated the severity of C.B.'s behavior, and ignored her attempts to satisfy the condition (ABA therapy) that Calvary itself established for C.B.'s return to the classroom.

Even construing the record in favor of Ms. Bryant, these contentions do not establish a genuine issue concerning the school's discriminatory intent. "[A] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006)). Ms. Bryant does not contest that C.B. threw objects in a classroom (at least one of which broke) in which other students were present, in violation of Calvary's conduct standards.

Nor does she contest that she never had C.B. evaluated for potential medication and delayed in seeking ABA therapy for him.  As a result, Ms. Bryant has not shown that Calvary's reasons for disciplining and requiring ABA therapy outside of Calvary for C.B. were false or so "weak[ ], implausibl[e], inconsiten[t], incoherent[t] or contradict[ory]" as to be "unworthy of credence."  *Id.* at 1348 (internal citation and quotation marks omitted).  She therefore has not created an issue of fact that Calvary's justifications were pretext for discrimination.

Finally, the fact that C.B.'s conduct improved at a new school (Sylvan) is not evidence that Calvary's disciplinary decision, taken in light of his misconduct *at Calvary*, was the product of intentional discrimination.  On the basis of the undisputed facts regarding C.B.'s misconduct and Ms. Bryant's delay in seeking the treatment Calvary requested, Calvary's disciplinary decisions do not raise an inference of discriminatory intent.  That Ms. Bryant views Calvary's justifications as pretextual—because she eventually did seek ABA therapy and because, in her view, C.B.'s misconduct was more minor than Calvary viewed it to be—does not raise a suspicion of discriminatory intent.

Summary judgment for Calvary on the § 1981 claim was therefore appropriate.

## V

The Rehabilitation Act, in § 504, provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). We have said that an "otherwise qualified individual" bringing a Rehabilitation Act claim must show that he has a disability, he is a qualified individual, and he faced unlawful discrimination due to his disability. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). Calvary argues that C.B. is unable to show that he has a disability or that he is otherwise qualified.

First, we look to whether C.B. has produced evidence from which a reasonable jury could find that he has a disability. The Rehabilitation Act incorporates the Americans with Disabilities Act's definitions of "disability" and "individual with a disability." *See* 29 U.S.C. §§ 705(9)(B) & (20)(B). A disability is "a physical or mental impairment that substantially limits one or more major life activities of [an] individual; a record of such an impairment; or [an individual] being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). An individual qualifies as "being regarded as having such an impairment" if "he or she has been subjected to [prohibited] action . . . because of an actual or perceived physical or mental impairment[.]" § 12102(3)(A). Through the Americans with Disabilities Act Amendments Act (ADAAA), Congress made clear that "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage" and "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," such as reasonable accommodations. § 12102(4)(A), (E)(i).

C.B. was diagnosed with autism spectrum disorder (autism) and attention deficit hyperactivity disorder (ADHD).  Ms. Bryant contends that C.B.'s autism and ADHD substantially limit his ability to learn, read, concentrate, and communicate, which are major life activities under the Americans with Disabilities Act.  *See* § 12101(2)(A).  Calvary, in response, points out that C.B. had good grades and contends that his diagnoses did not impair his ability to refrain from property destruction.

Calvary's responses mischaracterize our inquiry:  whether C.B. had good grades while receiving the accommodations afforded to him under his Student Support Plan has little bearing on the substantial limitation inquiry, which is determined "without regard" to such mitigating measures.  *See* § 12102(4)(E)(i).  And the ability to restrain from property destruction, even if it might qualify as a "major life activity," is not the only activity that could serve as the basis for finding a disability—Ms. Bryant's claim survives summary judgment on this element if she shows that C.B. had an impairment substantially limiting even "one . . . major life activit[y]."  § 12102(1)(A).

Ms. Bryant has produced sufficient evidence from which a reasonable factfinder could find that C.B. has a disability within the meaning of § 504.  As we have recognized elsewhere, "[a]utism is a neurological disorder that results in deficits in social communication and social interaction."  *L.M.P. v. School Bd. Of Broward Cnty.*, 879 F.3d 1274, 1279 (11th Cir. 2018).  *See also T.W. v. School Bd. Of Seminole Cnty.*, 610 F.3d 588, 593 (11th Cir. 2010) (characterizing

autism leading to behavioral problems as a disability). And regulations in the employment context list autism as a type of impairment that "substantially limits brain function." *See* 29 C.F.R. § 1630.2(j)(3)(iii). Consistent with these understandings, evidence in the record here supports Ms. Bryant's contention that the autism and ADHD diagnoses demonstrate that C.B. suffered from impairments that substantially limited certain major life activities. Dr. Weis' evaluation of C.B. indicated that he presented with symptoms of inattention and hyperactivity and had difficulty maintaining reciprocal social interaction, necessitating certain individualized support measures in the classroom. Indeed, following Dr. Weis' evaluation, Calvary placed C.B. in the Discovery Program (designed for students with learning differences), crafted a "Student Support Plan" for him to address his underperformance and need for academic support, and later encouraged Ms. Bryant to have C.B. evaluated for medication to enable him to "focus and cooperate" in the classroom. Viewing this evidence in the light most favorable to Ms. Bryant, we agree with the district court that a reasonable factfinder could find that C.B.'s autism and ADHD constituted impairments substantially limiting one or more major life activities, including his ability to learn, read, concentrate, and communicate.

Next, we consider whether C.B. is "a qualified individual" within the meaning of the Rehabilitation Act. "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979). An individual is otherwise qualified if he

can participate in the school environment, according to the school's standards, with or without a reasonable accommodation. *See School Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 (1987).[4]

Whether a requested accommodation is reasonable is a "fact-intensive" inquiry that "focuses on whether the costs and other burdens imposed by the proposed modification to an existing program amount to reasonable accommodation . . . or a substantial modification of the program." *Freeman v. Cavazos*, 939 F.2d 1527, 1532 (11th Cir. 1991). The distinction is important because § 504 does not require educational institutions to "make substantial modifications in their programs to allow disabled persons to participate." *Davis*, 442 U.S. at 405.

Ms. Bryant contends that the accommodation she requested was reasonable and that Calvary's refusal to provide it, and denial of C.B.'s return to in-person schooling, constituted unlawful discrimination based on his disability. The accommodation she requested was that Ms. Williams, an ABA-trained behavioral specialist, would assist in implementing an ABA service plan through which she would attend school with C.B., provide services and training as needed for free, and address his behavioral and disciplinary issues. Calvary refused to allow C.B. to return to in-class

---

[4] Because Ms. Bryant met her burden to demonstrate that a reasonable jury could find that C.B. has a disability within the meaning of the Rehabilitation Act, we do not address Calvary's argument that it need not, under 42 U.S.C. § 12201(h), provide reasonable accommodations to an individual merely "regarded as" having a disability.

instruction with Ms. Williams because, based on its disciplinary policy, C.B. was due to be removed from the classroom and because it viewed C.B.'s requested accommodation as unreasonable. Calvary maintains that C.B. is not qualified to return to a Calvary classroom without demonstrable progress in ABA therapy in another setting and contends that the presence of an ABA assistant to support C.B. in the classroom is inconsistent with the services Calvary provides and would restructure the classroom environment.

We agree that Calvary was not required to provide the accommodation that Ms. Bryant requested. As we have previously observed, "the Rehabilitation Act 'imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person.'" *Goldberg v. Florida Int'l Univ.*, 838 F. App'x 487, 492 (11th Cir. 2020) (quoting *Davis*, 442 U.S. at 413). Thus, a "school's unwillingness to make 'major adjustments' to its program to accommodate the disabled does not constitute disability discrimination." *Id.*

The record reflects that C.B.'s requested accommodation would require substantial modification to Calvary's programming. Ms. Bryant does not appear to dispute that in-class, one-on-one support is not generally available at Calvary. Nor does she respond to Calvary's concern that the imposition of a "shadow" ABA specialist would restructure its classroom environment. Ms. Bryant says that because Ms. Williams' services would be free of charge and eventually fade over time as C.B. improved, the accommodation is reasonable. But cost is not the only factor relevant to determining the

reasonableness of a requested accommodation.  Accommodations in the form of deviations from a school's academic or behavioral standards, whether costly to the school or not, may be unreasonable.  *See, e.g.*, *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464–66 (4th Cir. 2012) (modifications to medical school professionalism requirements are not required).  *See also St. Johnsbury Academy v. D.H.*, 240 F.3d 163, 173–74 (2d Cir. 2001) (modifications to academic requirements are not required); *Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1049 (9th Cir. 1999) (modifications to medical school curriculum and scheduling are not required).

As to the likelihood that Ms. Williams' intervention might fade over time, *Halpern* is instructive.  In that case a medical student's lack of professionalism—in the form of absenteeism and lack of interpersonal skills with staff and faculty members—eventually resulted in his dismissal.  *See Halpern*, 669 F.3d at 457–60.  He argued that the school should have allowed him "the opportunity to undergo treatment and demonstrate he could satisfy the [s]chool's professionalism standards."  *Id.* at 464.  The Fourth Circuit rejected the argument that this was a reasonable accommodation, reasoning that "the Rehabilitation Act and ADA do not obligate a school to permit a student to continue in an educational program with the hope that at some unknown time in the future he will be able to satisfy the program's essential requirements."  *Id.* at 466.  Without that additional accommodation, the court concluded that the plaintiff was unqualified for the program.  *Id.* at 467.

Here, C.B's request that Calvary permit him to return to the classroom *without* first showing demonstrable behavioral improvement in another setting and *with* a shadowing, one-on-one therapist in the classroom to help him satisfy its behavioral standards for an indefinite period of time would amount to a "substantial modification of the program," which Calvary is not obligated to provide. *See Davis*, 442 U.S. at 412–13.  Ms. Bryant asks, in effect, for an exemption from Calvary's disciplinary policies for C.B. while he progresses in ABA therapy and permission to conduct that therapy in a Calvary classroom with a third-party ABA specialist present.  Although C.B.'s behavior might well improve to the point that he could meet Calvary's standards at some point in the future, Calvary need not condone substantial modifications to its in-class programming and environment and lower its conduct standards to permit C.B. to continue in its classrooms before he can show he actually does meet its behavioral standards.  *See Halpern*, 669 F.3d at 466. Ms. Bryant has not demonstrated that an open-ended accommodation that deviates from Calvary's behavior and discipline standards is a reasonable one, whether or not it costs Calvary anything to implement.  Although reasonableness is often a question of fact for the jury to decide, it is Ms. Bryant's initial burden at summary judgment to demonstrate that a jury could find the accommodation reasonable, and she has not done so here.  *See Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997).

Absent that required modification, the record reflects that C.B. was not an otherwise qualified individual.  In *Todd v. Fayette County School District*, 998 F.3d 1203 (11th Cir. 2021), we reasoned

that where a plaintiff denies engaging in the conduct resulting in the disciplinary action, there is a genuine dispute as to whether he is a qualified individual. *See id.* at 1216. Here, however, there is no such dispute. Ms. Bryant does not dispute that C.B.'s incidents of misconduct occurred, including incidents involving property destruction. She also does not dispute that she did not seek the medication Calvary suggested to address C.B.'s behavioral problems and that she delayed seeking ABA therapy. In light of these deficiencies in C.B.'s conduct and Ms. Bryant's delay in redressing them as Calvary required, we agree with the district court that C.B. has not demonstrated that he was "otherwise qualified" to attend. We affirm the district court's order of summary judgment on Ms. Bryant's disability discrimination claims on that basis.

## VI

For the foregoing reasons, the judgment of the district court granting summary judgment to Calvary on each of Ms. Bryant's claims is affirmed.

**AFFIRMED.**